## TOLEDO, A. A. & N. M. RY. CO. v. PENNSYLVANIA CO. et al.

### (Circuit Court, N. D. Ohio, W. D. April 3, 1893.)

1. CIRCUIT COURTS—JURISDICTION — INJUNCTION AGAINST VIOLATION OF INTERSTATE COMMERCE LAW.

Circuit courts of the United States have jurisdiction of a bill in equity to restrain violations of the interstate commerce law to the irreparable injury of complainant, because of the subject-matter, and without regard to the citizenship of the parties.

2. SAME—CONSPIRACY—WHAT CONSTITUTES—REV. ST. § 5440.

A combination to induce and procure the officers of a common carrier corporation subject to the provisions of the interstate commerce act, and its locomotive engineers, to refuse to receive, handle, and haul interstate freight from another like common carrier in order to injure the latter, is a combination or conspiracy to commit the misdemeanor described by section 10 of the interstate commerce act, and, if any person engaged in it does an act in furtherance thereof, all combining for the purpose are guilty of criminal conspiracy, as denounced by section 5440, Rev. St.

3. SAME—COMMON CARRIERS.

If the common carrier company against whom such a conspiracy is directed is injured by acts done in furtherance of it, it has a cause of action for its loss against all of those engaged in the conspiracy.

4. SAME—TEMPORARY INJUNCTION—WHEN ISSUED.

The injury which will be caused to the common carrier against which such a conspiracy is directed will be irreparable, and, in order to prevent this, and maintain the status quo until full relief can be granted, a preliminary and temporary mandatory injunction will issue against the company and its employes threatening the injury, restraining them from refusing to afford the proper interchange of interstate freight and traffic facilities to complainant.

5. SAME—ENJOINING RAILROAD COMPANY—EFFECT ON EMPLOYES.

The employes, while in the employ of the defendant company, must obey this mandatory injunction, but may, without contempt of court, avoid or evade obedience thereto by ceasing to be such employes; otherwise the injunction would, in effect, be an order compelling the employes to continue the relation of servant to the complainant,—a kind of order never yet issued by a court of equity.

6. SAME—ENJOINING CONSPIRATORS.

A preliminary injunction may issue against the chief member of such a conspiracy as that above described to restrain him from giving the order and signal which will result and is intended to result in the unlawful and irreparable injuries to the complainant. Where such chief member has already issued such an unlawful, willful, and criminal order, the injurious effect of which will be continuing, the court may by mandatory injunction compel him to rescind the same, especially when the necessary effect of the order or signal is to induce and procure flagrant violations of an injunction previously issued by the court.

In Equity. Bill by the Toledo, Ann Arbor & North Michigan Railway Company against the Pennsylvania Company and others. On motion for a temporary injunction against defendant P. M. Arthur, chief of the Brotherhood of Locomotive Engineers. Granted.

Alex. L. Smith and E. W. Tolerton, for complainant.

Frank H. Hurd, Jas. H. Southard, and Judge Barber, for defendant Arthur.

J. W. Harper, for defendant Sargent.

Before TAFT, Circuit Judge, and RICKS, District Judge.

TAFT, Circuit Judge. This is a motion by the complainant, the Toledo, Ann Arbor & North Michigan Railway Company, for a tem-

porary injunction, to remain in force pending this action, against P. M. Arthur, the chief executive of the Brotherhood of Locomotive Engineers, and a defendant herein, to restrain him from issuing, promulgating, or continuing in force any rule or order of said brotherhood, which shall require or command any employes of any of defendant railway companies herein to refuse to handle and deliver any cars of freight in course of transportation from one state to another to the complainant, or from refusing to receive and handle cars of such freight which have been hauled over complainant's road; and also from in any way, directly or indirectly, endeavoring to persuade any of the employes of the defendant railway companies whose lines connect with the railroad of complainant not to extend to said company the same facilities for interchange of interstate traffic as are extended by said companies to other railway companies. A temporary restraining order to this effect was issued by me against Arthur ex parte. A hearing has since been had, and the question now is whether, on the evidence produced, the order shall be continued in force until the final decision of the case.

The original bill was filed against eight railway companies and the superintendents of two of them, and averred that the defendants, who were operating lines of railway connecting with that of the complainant company at Toledo, had threatened to refuse to receive from and to deliver to the complainant company interstate freight on the ground that their locomotive engineers, who were members of the brotherhood, would refuse to haul or handle the same, because complainant employed on its line engineers who were not members of the brotherhood; and the bill further averred that if the threat was carried out it would work an irreparable injury to the complainant, for which damages could not be estimated, and the law afforded no adequate remedy. The prayer of the bill was for an order enjoining the defendant companies, their employes and servants, from refusing to receive and deliver complainant's interstate freight. A temporary order as prayed for was issued by Judge Ricks. An amendment to the bill was afterwards filed making two new defendants, P. M. Arthur and F. P. Sargent. Sargent, it subsequently appeared, was a nonresident of the district, and the bill as against him was dismissed for want of jurisdiction. As to Arthur, the amendment charges that he, as chief of the brotherhood, exercises a controlling influence upon its members in all matters treated by its rules and regulations; that one of its rules requires all of its members in the employ of any railway company, whenever an order to that effect shall be given by its said chief officer, to refuse to receive, handle, or carry cars of freight from any other railroad company whose employes, members of said association, have engaged in a strike; that such a strike has been declared against the complainant by the members of the brotherhood, with Arthur's consent and approval; that Arthur now publicly announces that, unless complainant shall submit to the demands of its striking employes, he will order the rule above stated enforced; that the rule is in direct contravention of the interstate commerce law, and is intended to induce the employes of the defendant companies to violate that law and the previ-

ous order of this court; and that Arthur, with others, is conspiring to that end.

The jurisdiction of this court to hear and decide the case made by the bill cannot be maintained on the ground of the diverse citizenship of the parties, for the complainant and at least one of the defendants are citizens of the same state. If it exists, it must arise from the subject-matter of the suit. The bill invokes the chancery powers of this court to protect the complainant in rights which it claims under the act of congress passed February 4, 1887, (24 St. at Large, p. 379,) known as the "Interstate Commerce Act," and an act amending it passed March 2, 1889, (25 St. at Large, p. 855.) These acts were passed by congress in the exercise of the power conferred on it by the federal constitution (article 1, § 8, par. 3) "to regulate commerce with foreign nations, among the several states, and with the Indian tribes." Counsel for defendant Arthur contend that the interstate commerce law and its amendments are only declaratory of the common law, which gave the same rights to complainant, and that, therefore, this is not a case of federal jurisdiction. The original jurisdiction of this court extends by act of congress passed August 13, 1888, (25 St. at Large, p. 433,) to "all suits of a civil nature, at common law or in equity, where the matter in dispute exceeds, exclusive of interest and costs, the sum or value of $2,000, and arising under the constitution or laws of the United States." The bill makes the necessary averment as to the amount in dispute. It is immaterial what rights the complainant would have had before the passage of the interstate commerce law. It is sufficient that congress, in the constitutional exercise of power, has given the positive sanction of federal law to the rights secured in the statute, and any case involving the enforcement of those rights is a case arising under the laws of the United States.

The Brotherhood of Locomotive Engineers is an association, organized in 1863, whose members are locomotive engineers in active service in the United States, Mexico, and the dominion of Canada. Their number is 35,000. The engineers engaged with the defendant companies are most of them members of the brotherhood. The purpose of the brotherhood is declared in its constitution to be "more effectually to combine the interests of locomotive engineers, to elevate their standing as such, and their character as men." These ends are sought to be obtained by requiring that every member shall be a man of good moral character, of temperate habits, and a locomotive engineer in actual service with a year's experience, and by imposing the penalty of expulsion upon any member guilty of disgraceful conduct or drunkenness, of neglect of duty, of injury to the property of the employer, or of endangering the lives of persons. A mutual insurance association is supported in connection with the brotherhood, in which every member is required to carry a policy, and there is an efficient employment bureau for the members. A strong and complete organization is maintained for the systematic government of the brotherhood, and its rules are well adapted to establishing and carrying out general and local plans with respect to the terms of employment of its members. Submission to these

plans, when once adopted by requisite vote, is required of every member on penalty of expulsion. The management of controversies with employer companies is immediately with a chairman of a standing general adjustment committee for the particular railroad system involved and afterwards with the grand chief. The grand chief has large judicial and executive powers. He is the ultimate authority always called in to adjust differences between members and their employer, and he is the one to whom appeals are made to settle disputes arising between members and subdivisions. He is also the head of the insurance company.

Early last month the superintendent of complainant company refused to grant a demand by its engineers for higher wages. After some unsuccessful attempts at negotiation, Arthur, who had been called in, consented to the strike, which had previously been voted by two thirds of the brotherhood men in complainant's employ. As soon as the men went out on March 7th, Arthur sent to eleven chairmen of the general adjustment committees on as many different railroad systems in Ohio and the neighboring states the following dispatch:

"There is a legal strike in force upon the Toledo, Ann Arbor & North Michigan Railroad. See that the men on your road comply with the laws of the brotherhood. Notify your general manager."

A "legal" strike, in brotherhood parlance, means one consented to by the grand chief. His consent is necessary, under the rules of the order, to entitle the men thus out of employment to the three months' pay allowed to striking members. Arthur admits that the particular law to which he referred in this dispatch was one adopted by the brotherhood at Denver three years ago, but which is not published in the printed copy of the constitution and by-laws. It is as follows:

"Twelfth. That hereafter, when an issue has been sustained by the grand chief, and carried into effect by the B. of L. E., it shall be recognized as a violation of obligation for a member of the Brotherhood of Locomotive Engineers Association who may be employed on a railroad running in connection with or adjacent to said road, to handle the property belonging to said railroad or system in any way that may benefit said company in which the B. of L. E. is at issue until the grievance or issue of whatever nature or kind has been amicably settled."

It is quite clear from the evidence that "a violation of obligation" is the highest offense of which a member can be guilty, and merits expulsion. In obedience to Arthur's direction, it appears that several general managers were notified of the intention to enforce the rule. Watson, the chairman of the adjustment committee on the Lake Shore system, sent the general manager of that system the following telegram:

"We ask you, in the interests of peace and harmony, not to ask your engineers to handle Toledo, Ann Arbor & North Michigan freight business after 6 o'clock, March 8, as the engineers and firemen of said road go out on a strike."

Through the intervention of the Ohio labor commissioner, William Kirkby, negotiations for an adjustment began between Arthur and

the local brotherhood committee on the one side and the complainant on the other. Kirkby refused to take part until the embargo laid on complainant's freight was raised. Accordingly, on March 11th, in Arthur's absence, his assistant sent in Arthur's name the following dispatch to chairmen of adjustment committees:

"Pending negotiations with the president of the Toledo & Ann Arbor road, resolution twelve, page forty-five, of ritual is suspended. In case negotiations fail, you will be promptly notified."

Arthur says that he, did not know of this dispatch when sent, but that he subsequently approved it. On March 13th, as a result of the negotiations referred to in the telegram of March 11th, the following paper was signed by Arthur and others for the striking engineers:

"We, the undersigned, late employes of the motive power department of the Toledo & Ann Arbor Railroad, have authorized our chief executive officers to withdraw the embargo against connecting roads. Should we be reinstated, we hereby agree each for himself to submit to William Kirkby, railroad commissioner, as our representative in all matters of grievances touching orders issued by officials, with authority to confer with Gov. Ashley, president of the Toledo & Ann Arbor Railroad, and we hereby agree to abide by their concurrent decision. This will also include the return of the men without prejudice, and the rates of pay to be agreed upon."

A schedule of wages was agreed upon, but the negotiations were subsequently broken off because the striking engineers refused to consent to a requirement that applications in writing should be made for employment by each one of their number. Thereupon, on March 16th, Arthur sent to the committee chairmen the following dispatch:

"All efforts to effect an honorable settlement of the grievances of the engineers and firemen on the Toledo, Ann Arbor & North Michigan Railroad have failed. See that your men comply with the laws of the brotherhood. Notify your general manager."

The result of this was that engineers, members of the brotherhood, did refuse to handle complainant's freight on connecting lines for a short time, and in several instances quit the service rather than do so. On the 17th of March the temporary restraining order issued by me, and above referred to, was served on Arthur. He was therein commanded to rescind any order he might have promulgated to engineers on connecting lines to refuse to handle complainant's freight. Under advice of counsel he obeyed, and sent a dispatch to committee chairmen rescinding his previous dispatch of March 16th. This had the effect to lift the "embargo," so called.

The result of this evidence is that the members of the Brotherhood of Locomotive Engineers have by the adoption of rule 12 made an agreement among themselves that whenever any of their comrades, with the consent of Arthur, leave the employ of one company, because the terms of employment are unsatisfactory, the members employed by companies operating connecting lines will inflict an injury on the first company by preventing, as far as possible, the first company from doing any business as a common carrier, involving the interchange of freight with connecting lines. The engineers of the

connecting lines are to effect this purpose—First, by refusing to handle the freight of the offending company, and, second, if necessary, by quitting the service to avoid handling it, in order that the connecting companies, by fear of the evil effect of a strike upon their own business, will be compelled to join with their engineers in a refusal to handle the offending company's freight and inflict the injury which is the main purpose of the combination. In this connection should be noted, in Arthur's telegrams of March 7th and 16th, directing the enforcement of rule 12, the significance of the sentence, "Notify your general manager," and the language of Watson's dispatch to the general manager of the Lake Shore system. These notifications were threats to the connecting companies, which it was hoped would lead them to assist in injuring the complainant company. No such notice was thought necessary when rule 12 was suspended.

Rule No. 12 is not operative until a strike has been declared with the consent of Arthur. Arthur states that there is nothing in the rules requiring him to communicate with the committee chairmen as he did, and that the rule would execute itself. But it is obvious that, as under the rule he must declare a strike "legal" before its consequences follow, he is the person upon whom devolves the task of authoritatively, advising the rest of the brotherhood, through their immediate chairmen, that the time has come for the enforcement of the rule and the injury of the offending company. That he and the members of the brotherhood recognize this as a necessity is clear from the evidence of Watson, and what actually occurred here. On March 8th the rule was enforced by his order. On March 11th the rule was suspended by an order issued in his name. On March 16th the rule was again enforced by telegraphic order from him, and upon March 18th the enforcement of the rule was again suspended. Arthur says that neither he nor his assistant had power under the constitution and by-laws of the brotherhood to suspend the enforcement of rule 12, and that the dispatch of March 11th doing so was an unconstitutional assumption of power on his part. We are not called upon to construe the constitution and laws of the brotherhood except so far as they reflect on the actual power exercised by Arthur in the enforcement of rule 12. It suffices to say that so much of the governing law of the brotherhood as we have seen invests Arthur with wide powers, and a great influence over the actions of his subordinates and the brotherhood members, and that in the practical exercise of power he has twice both directed and suspended the enforcement of rule 12.

It will be convenient, in discussing the question whether any relief can properly be given to complainant against Arthur, to consider rule 12 and the acts done, or to be done, in pursuance thereof—First, in the light of the criminal law; second, with reference to their character as civil wrongs; and, third, with reference to the remedies which a court of equity may afford against them.

1. The complainant and defendant companies are common carriers, subject to the provisions of the interstate commerce act, and the business exchanged between them is averred by the bill to be

nearly all interstate freight. The second paragraph of the third section of the act provides that—

"All common carriers subject to the provisions of this act shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivery of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines." 24 St. at Large, p. 379.

In view of the foregoing section, it needs no argument to demonstrate that one common carrier is expressly required by the interstate commerce act to freely interchange interstate freight with another when their lines connect.

Section 10 of the act, as amended, (25 St. at Large, p. 855,) provides that—

"Any common carrier subject to the provisions of this act, or, when such common carrier is a corporation, any director or officer thereof, or any receiver, trustee, or lessee, agent, or person acting for or employed by such corporation, who alone or with any other corporation, company, person, or party, * * * shall willfully omit or fail to do any act, matter, or thing in this respect required to be done, or shall cause or willingly suffer or permit any act, matter, or thing, so directed or required by this act to be done, not to be done, or shall aid or abet such omission or failure, * * * shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any district court of the United States within the jurisdiction of which such offense was committed, be subject to a fine of not exceeding $5,000."

By the foregoing section, a common carrier which is not a corporation is made liable criminally for violations of the interstate commerce law. But when the carrier is a corporation and violates the law, not the corporation, but its officers, agents, and persons acting for or employed by it who willfully do the wrongful work, are made liable. In re Peasley, 44 Fed. Rep. 271. The corporation is made civilly liable under section 8. As every locomotive engineer of the defendant companies is a "person employed by" a common carrier corporation subject to the provisions of the interstate commerce law, he is guilty of the offense described, and subject to the penalty imposed by section 10, if he, while acting as engineer for his corporation, refuses to handle interstate freight for the complainant, and thereby, in his discharge of a function of the company, willfully omits to do an act required by the law to be done; and it is immaterial whether what he does or fails to do in violation of the statute is with or without the orders of his principal. U. S. v. Tozer, 37 Fed. Rep. 635.

Arthur and all the members of the brotherhood engaged in enforcing rule 12, and in thereby aiding and abetting every such engineer to violate the section, are equally guilty with him as principals, (U. S. v. Snyder, 14 Fed. Rep. 554;) and they are thereby also guilty of conspiring to commit an offense against the United States, and subject to the penalties of section 5440, Rev. St., (U. S. v. Stevens, 44 Fed. Rep. 132.)

But suppose that this view of section 10 is erroneous, and that the words, "person acting for or employed by such corporation," refer only to its managing officer or agent, the enforcement of rule

12, with its evident purpose, would still be a violation of law; for even then it is quite clear that any one, though not an officer or agent, successfully aiding, abetting, or procuring such officer or agent to violate the section, would be punishable under it as a principal. Thus, in U. S. v. Snyder, 14 Fed. Rep. 554, under a statute making it a crime for a postmaster to render a false report to the government of his receipts, one who aided, abetted, and procured a postmaster to send such a report was found guilty as principal of violating the statute, and the conviction was sustained by Judges McCrary and Nelson, in an opinion citing authorities fully justifying their conclusion. It is therefore evident that Arthur and the other members of the brotherhood, if successful in procuring the managing officers of the defendant companies to refuse to handle interstate freight from complainant company, would be guilty of violating section 10, and punishable as principals thereunder.

Section 5440, Rev. St., provides that—

"If two or more persons conspire * * * to commit any offense against the United States, * * * and one or more parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than $10,000, or to imprisonment for not more than two years, or to both fine and imprisonment, in the discretion of the court."

All persons combining to carry out rule 12 of the brotherhood against the complainant company, if any one of them does an act in furtherance of the combination, are punishable under the foregoing section. This is true, because, as already shown, the object of the conspiracy is to induce, procure, and compel the managing officers of the defendant companies to refuse equal facilities to the complainant for the interchange of interstate freight, which, as we have seen, is an offense against the United States by virtue of section 10, above quoted. For Arthur to send word to the committee chairmen to direct the men to refuse to handle interstate freight of complainant, and to notify the managing officers of the defendant companies with the intention of procuring them to do so, all in execution of rule 12, is an act in furtherance of the conspiracy to procure the managing officers of the defendant companies to commit a crime, and subjects him and all conspiring with him to the penalties of section 5440, Rev. St. Again, for the men, in furtherance of rule 12, either to refuse to handle the freight or to threaten to quit, or actually to quit, in order to procure or induce the officers of the defendant companies to violate the provisions of the interstate commerce law, would constitute acts in furtherance of the conspiracy, and would render them also liable to the penalty of the same section.

But it is said that it cannot be unlawful for an employe either to threaten to quit or actually to quit the service when not in violation of his contract, because a man has the inalienable right to bestow his labor where he will, and to withhold his labor as he will. Generally speaking, this is true, but not absolutely. If he uses the benefit which his labor is or will be to another, by threatening to withhold it or agreeing to bestow it, or by actually withholding it or bestowing it, for the purpose of inducing, procuring, or compel-

ling that other to commit an unlawful or criminal act, the withholding or bestowing of his labor for such a purpose is itself an unlawful and criminal act. The same thing is true with regard to the exercise of the right of property. A man has the right to give or sell his property where he will, but if he give or sell it, or refuse to give or sell it, as a means of inducing or compelling another to commit an unlawful act, his giving or selling it or refusal to do so is itself unlawful.

Herein is found the difference between the act of the employes of the complainant company in combining to withhold the benefit of their labor from it and the act of the employés of the defendant companies in combining to withhold their labor from them; that is, the difference between the strike and the boycott. The one combination, so far as its character is shown in the evidence, was lawful, because it was for the lawful purpose of selling the labor of those engaged in it for the highest price obtainable, and on the best terms. The probable inconvenience or loss which its employes might impose on the complainant company by withholding their labor would, under ordinary circumstances, be a legitimate means available to them for inducing a compliance with their demands. But the employes of defendant companies are not dissatisfied with the terms of their employment. So far as appears, those terms work a mutual benefit to employer and employed. What the employes threaten to do is to deprive the defendant companies of the benefit thus accruing from their labor, in order to induce, procure, and compel the companies and their managing officers to consent to do a criminal and unlawful injury to the complainant. Neither law nor morals can give a man the right to labor or withhold his labor for such a purpose.

It may be noted, in passing, that the enforcement of rule 12 presents a much stronger case of illegality than the ordinary boycott. As usually understood, a boycott is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them. Ordinarily, when such a combination of persons does not use violence, actual or threatened, to accomplish their purpose, it is difficult to point out with clearness the illegal means or end which makes the combination an unlawful conspiracy; for it is generally lawful for the combiners to withdraw their intercourse and its benefits from any person, and to announce their intention of doing so, and it is equally lawful for the others, of their own motion, to do that which the combiners seek to compel them to do. Such combinations are said to be unlawful conspiracies, though the acts in themselves and considered singly are innocent, when the acts are done with malice, i. e. with the intention to injure another without lawful excuse. See the judgment of Lord Justice Bowen in Steamship Co. v. McGregor, 23 Q. B. Div. 598; Temperton v. Russell [1893] 1 Q. B. 715; Walker v. Cronin, 107 Mass. 555; Casey v. Typographical Union, 45 Fed. Rep. 135; Old Dominion Steamship Co. v. McKenna, 30 Fed. Rep. 48; State v. Glidden, 55 Conn. 76, 8 Atl. Rep. 890; State v. Stewart, 59 Vt. 273, 9 Atl. Rep. 559;

Crump v. Com., 84 Va. 927, 6 S. E. Rep. 620; State v. Donaldson, 32 N. J. Law, 151; Carew v. Rutherford, 106 Mass. 1; Moores v. Bricklayers' Union, 23 Wkly. Law Bul. 48. But in the case at bar, although malice is certainly present, the illegality of the combination does not consist alone in that, for both the means taken by the combination and its object are direct violations of both the civil and the criminal law as embodied in a positive statute. Surely it cannot be doubted that such a combination is within the definition of an unlawful conspiracy, recognized and adopted by the supreme court of the United States in Pettibone v. U. S., (decided March 6, 1893,) 13 Sup. Ct. Rep. 542, to wit: "A combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or some purpose, not in itself criminal or unlawful, by criminal or unlawful means."

We have thus considered with some care the criminal character of rule 12 and its enforcement, not only because, as will presently be seen, it assists in determining the civil liabilities which grow out of them, but also because we wish to make plain, if we can, to the intelligent and generally law-abiding men who compose the Brotherhood of Locomotive Engineers, as well as to their usually conservative chief officer, what we cannot believe they appreciate, that, notwithstanding their perfect organization, and their charitable, temperance, and other elevating and most useful purposes, the existence and enforcement of rule 12, under their organic law, make the whole brotherhood a criminal conspiracy against the laws of their country.

2. We now come to the character of rule 12, and its enforcement as a civil wrong to complainant. Lord Justice Fry said in the case of Steamship Co. v. McGregor, 23 Q. B. Div. 598, 624:

"I cannot doubt that whenever persons enter into an indictable conspiracy, and that agreement is carried into execution by the conspirators by means of an unlawful act or acts which produce private injury to some person, that person has a cause of action against the conspirators."

See, also, Buffalo Lubricating Oil Co. v. Standard Oil Co., 106 N. Y. 669, 12 N. E. Rep. 825; Steamship Co. v. McKenna, 30 Fed. Rep. 48; Carew v. Rutherford, 106 Mass. 1; and Moores v. Bricklayers' Union, 23 Wkly. Law Bul. 48.

Under the principle above stated, Arthur and all the members of the brotherhood engaged in causing loss to the complainant are liable for any actual loss inflicted in pursuance of their conspiracy. The gist of any such action must be not in the combination or conspiracy, but in the actual loss occasioned thereby. No civil liability arises simply because of the rule 12, or its attempted enforcement, unless injury is done. Ordinarily the only difference between the civil liability for acts in pursuance of a conspiracy and for acts of the same character done by a single person is in the greater probability that such acts when done by many in a combination will cause injury. If a single engineer of one of defendant companies, acting alone, and with intent to injure the complainant, should cause the complainant loss by refusing to handle its interstate freight, complainant could maintain a right of action against him for dam-

ages. The refusal on his part would be a wrongful and illegal act under the interstate commerce law, and, as said by Lord Justice Brett in Bowen v. Hall, 6 Q. B. Div. 333, 337: "Whenever a man does an act which in law and in fact is an unlawful act, and such an act as may, as a natural and probable consequence of it, produce injury to another, and which in the particular case does produce such an injury, an action on the case will lie." And so, if a single engineer, with intent to injure complainant, could, by threatening to quit or by actually quitting for the purpose, procure or induce the defendant company, in whose employ he is, to inflict a loss upon complainant by unlawfully refusing to interchange interstate freight, complainant could hold him civilly liable for the loss. By section 8 of the interstate commerce law the complainant is expressly given a cause of action in damages against any connecting common carrier company for such a loss, and it is clear upon the authorities that any one intentionally procuring the connecting company to inflict such loss would be equally liable. Thus in Walker v. Cronin, 107 Mass. 555, the supreme judicial court of that state sustained an action for damages by the plaintiff, who was a shoe manufacturer, against the defendant, for inducing plaintiff's employes to break their contracts of service with him to his injury. In Lumley v. Gye, 2 El. & Bl. 216, it was held that the plaintiff could recover damages from the defendant for procuring a third person, with whom the plaintiff had made a contract, to break the contract, when such procuring was with the intention of injuring the plaintiff. The same principle was announced in Bowen v. Hall, 6 Q. B. Div. 333, 337, and has since been followed in other cases, and the doctrine has been applied, even where there was not a binding contract, but only the probability that one, though not binding, would be performed. See Rice v. Manley, 66 N. Y. 82, and Benton v. Pratt, 2 Wend. 385. If a person, with rights secured by a contract, may, in case of loss, recover damages from one not a party to the contract, who, with intent to injure him, induces a breach of it, a fortiori can one whose rights are secured by statute recover damages from a person who, with intent to injure him, procures the violation of those rights by another, and causes loss. The difficulty in supposing or stating any civil liability when the acts we have been discussing are done by a single engineer is in the improbability that either by singly refusing to handle the freight he could cause any injury to complainant, or by singly threatening to quit, or by quitting, he could procure his company to do so. But when we suppose that all, or nearly all, the engineers on the eight different defendant companies combine with their chief to do these unlawful acts for the purpose of injuring complainant, the intended loss becomes not only probable, but inevitable.

3. Having thus shown that Arthur and all the members of the brotherhood with him, conspiring by enforcing rule 12 to injure complainant, will be liable in damages to complainant for any loss they may thereby occasion, the question remains, can equity afford any relief by preliminary injunction to prevent the loss?

We shall be assisted in answering the question by considering,

first, what the court may do by injunction against the defendant companies and against the engineers, under the averment of the bill that the defendant companies threaten to refuse to interchange freight with complainant because of the refusal of their engineers to handle it.

The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief. Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant, which he appeals to a court of equity to protect him from. In such a case courts of equity issue mandatory writs before the case is heard on its merits. Robinson v. Lord Byron, 1 Brown, Ch. 588; Lane v. Newdigate, 10 Ves. 192; Hervey v. Smith, 1 Kay & J. 392; Beadel v. Perry, L. R. 3 Eq. 465; London & N. W. Ry. Co. v. Lancashire & Y. Ry. Co., L. R. 4 Eq. 174; Whitecar v. Michenor, 37 N. J. Eq. 6; Broome v. Telephone Co., 42 N. J. Eq. 141, 7 Atl. Rep. 851.

Now, the normal condition—the status quo—between connecting common carriers under the interstate commerce law is a continuous passage of freight backward and forward between them, which each carrier has a right to enjoy without interruption, exactly as riparian owners have a right to the continuous flow of the stream without obstruction. Since Lord Thurlow's time the preliminary mandatory injunction has been used to remove obstructions and keep clear the stream. Robinson v. Lord Byron, 1 Brown, Ch. 588; Lane v. Newdigate, 10 Ves. 192. So an obstruction to the flow of interstate freight must be preliminarily enjoined, even though it requires a mandatory injunction. The quasi public nature of the duty to be performed by the common carriers and the irreparable character of the injury likely to result are ample grounds for this. The interstate commerce law recognizes the necessity for such a remedy, for in summary equity proceedings at the instance of the interstate commerce commission, provided by section 16, as amended in 1889, express power to issue injunctions, mandatory or otherwise, to prevent violations of the orders of the commission, is given to circuit courts. In addition to that, a remedy by mandamus in the district and circuit courts is given to an interested person to compel compliance by the common carrier with the provisions of the act. As this latter proceeding is denominated "cumulative" in the statute, it does not prevent the remedy by injunction, nor would it, in any event, because the inadequacy of the legal remedy which justifies equitable intervention by injunction is only the inadequacy of a recovery in damages by action at law. Attorney General v. Mid Kent Ry. Co., L. R. 3 Ch. App. 100.

As against the defendant companies the complainant is, therefore, clearly entitled to a preliminary mandatory injunction to compel them, pending the hearing, to discharge the duties imposed by the interstate commerce law, and to exchange with complainant interstate freight. This was expressly decided by Judge Love of the Iowa district in a well-considered opinion in the case

of Chicago, B. & Q. Ry. Co. v. Burlington, C. R. & N. Ry. Co., 34 Fed.
Rep. 481. And in analogous cases, where it has been sought to en-
force the common-law obligation of a common carrier, the prelim-
inary mandatory injunction has frequently issued. Thus, in the case
of Coe v. Railroad Co., 3 Fed. Rep. 775, Judge Baxter issued a pre-
liminary mandatory injunction to compel the defendant railroad com-
pany to deliver and receive cattle at a particular cattle yard. See,
also, Chicago & A. Ry. Co. v. New York, L. E. & W. Ry. Co., 24 Fed.
Rep. 516; Wolverhampton & W. Ry. Co. v. London & N. W. Ry. Co.,
L. R. 16 Eq. 433; Denver & N. O. R. Co. v. Atchison, T. & S. F. R.
Co., 15 Fed. Rep. 650; Scofield v. Railway Co., 43 Ohio St. 571, 3 N.
E. Rep. 907.

If a preliminary mandatory injunction may issue against the
defendant companies to prevent irreparable injury, it may certainly
issue against their officers, agents, employes, and servants. This is
the usual form of the writ of injunction to prevent a trespass,
a nuisance, waste, or other inequitable act. Mr. Kerr says, in his
work on Injunctions, (1st Ed., p. 559:)

"Though an injunction restraining the act complained of is claimed against
the defendant alone, the order will, if necessary, be extended to his servants,
workmen, and agents; and it is of course to insert these words."

Fost. Fed. Pr. (1st Ed.) 234; 2 Daniell, Ch. Pr. (5th Amer. Ed.)
1673; Seton, Decrees, (4th Ed.) 173; Lord Wellesley v. Earl of
Mornington, 11 Beav. 180; Hodson v. Coppard, 29 Beav. 4; Mexican
Ore Co. v. Guadalupe Min. Co., 47 Fed. Rep. 351, 356.

The necessity for inserting the words in the injunction issued
against the defendant companies in the present case was made
apparent by the averment of the bill that they had threatened to
refuse to handle complainant's freight because of the unwillingness
of their engineers to handle it. Mandatory, as well as prohibitory,
injunctions have frequently been made to run against the defendant,
his agents, servants, and workmen. In Smith v. Smith, L. R. 20
Eq. 500, Sir George Jessel, M. R., issued a mandatory injunction
requiring the defendant to take down a wall which obstructed the
light, and that injunction ran against the defendant, his contractors,
builders, agents, and workmen. See Seton, Decrees, (Heard's 1st
Amer. Ed. from 4th Eng. Ed.) 89. A similar mandatory decree
was entered against the defendant, his servants, etc., for permit-
ting an obstruction of the flow of water in a stream to continue on
his lands. Seton, Decrees, 103; Ivimey v. Stocker, L. R. 1 Ch. App.
396.

This form of injunction against a corporation is generally nec-
essary in order to enable the court to enforce its writ. A corpora-
tion acts only through its officers and employes, and it is through
them only that its action can be restrained or compelled. While
doing the work of the company, the employe is the company, and,
having notice of a mandate from a court of competent jurisdiction
as to how that work must be done, he must in his work obey the
mandate. Especially is this true with respect to employes of com-
mon carrier corporations subject to the interstate commerce law.

They are fully identified with their employer in the discharge of its public functions. When doing the work of the corporation, they are made criminally liable for disobeying the commands of the law to the corporation. Nor is it an objection to granting complainant this equitable relief directly against the servants of defendant companies that the latter will be bound under the mandate of the court to discharge servants refusing to obey the law and the order of the court. The complainant is not required to await this action on the part of the defendant companies, or to suffer the delay which a refusal by the servants may entail. Such a refusal will be no defense to the defendant companies, (Chicago, B. & Q. Ry. Co. v. Burlington, C. R. & N. Ry. Co., 34 Fed. Rep. 481,) but this is far from saying that the court may not, in complainant's interest, direct its process at once against all assuming to act for defendant companies in their business. Nor is the mandatory injunction against the engineers an enforced specific performance of personal service. It is only an order restraining them, if they assume to do the work of the defendant companies, from doing it in a way which will violate not only the rights of the complainant, but also the order of the court made against their employers to preserve those rights.

They may avoid obedience to the injunction by actually ceasing to be employes of the company; otherwise the injunction would be, in effect, an order on them to remain in the service of the company, and no such order was ever, so far as the authorities show, issued by a court of equity. It is true that, if they quit the service of the company in execution of rule 12, in order to procure or compel defendant companies to injure the complainant company, they are doing an unlawful act, rendering themselves liable in damages to the complainant if any injury is thereby inflicted, and that they may be incurring a criminal penalty, as already explained, but, no matter how inadequate the remedy at law, the arm of a court of equity cannot be extended by mandatory injunction to compel the enforcement of personal service as against either the employer or the employed. Stocker v. Brockelbank, 3 Macn. & G. 250; Johnson v. Railroad Co., 3 De Gex, M. & G. 914; Picker'ng v. Bishop of Ely, 2 Younge & C. Ch. 249; Lumley v. Wagner, 1 De Gex, M. & G. 604. The reason is obvious. It would be impracticable to enforce the relation of master and servant against the will of either. Especially is this true in the case of railway engineers, where nothing but the most painstaking and devoted attention on the part of the employe will secure a proper discharge of his responsible duties; and it would even seem to be against public policy to expose the lives of the traveling public and the property of the shipping public to the danger which might arise from the enforced and unwilling performance of so delicate a service.

We finally reach the question whether Arthur can be enjoined from ordering the engineers to carry out rule 12. That he intends to enforce the rule, if not enjoined, is not denied. If, as we have seen, the injury intended is of such a character that the court may issue its mandatory injunction against the engineers to prevent them from inflicting it, Arthur may certainly be restrained by prohibitory

injunction from ordering them to inflict it. Arthur's order, if issued, will be obeyed, because the penalty of disobedience is expulsion from the brotherhood. The many engineers who serve the defendant companies will refuse to handle the complainant's freight. The defendant companies will probably be coerced thereby to refuse complainant's freight, for the bill avers that they have threatened to do so. The interstate business of complainant will be interrupted and interfered with, at every hour of the day, and at every point within a radius of many miles, and all because of Arthur's order. The injury will be irreparable, and a judgment for damages at law will be wholly inadequate. The authorities leave no doubt that in such a case an injunction will issue against the stranger who thus intermeddles, and harasses complainant's business. In Sherry v. Perkins, 147 Mass. 212, 17 N. E. Rep. 307, the officers of a trade union were enjoined by the supreme judicial court of Massachusetts from displaying in front of plaintiff's premises a banner announcing a strike, and requesting workmen to stay away. This was said to cause an injury of such a continuing character as to make it a nuisance. So, in Spinning Co. v. Riley, L. R. 6 Eq. 551, a case presenting facts exactly like those in Sherry v. Perkins, an injunction was allowed. In Casey v. Typographical Union, 45 Fed. Rep. 135, Judge Sage granted an injunction against the members of a typographical union who had instituted a boycott against a newspaper, and who were attempting to drive away business from it by threatening its subscribers and advertisers to boycott them in case they continued their patronage. In Emack v. Kane, 34 Fed. Rep. 47, Judge Blodgett granted an injunction against persons who, by threatening infringement suits, without any intention of bringing them, were attempting to interfere with plaintiff's enjoyment of his lawful patent. And in Coeur D'Alene Consol. & Min. Co. v. Miners' Union, 51 Fed. Rep. 260, Judge Beatty enjoined the members of a union from intimidating plaintiff's workmen, and thereby preventing them from continuing in its employ. Arthur's proposed invasion of complainant's rights, in the means to be employed, and the character of the injury intended, is quite like the wrongs enjoined in the cases just cited. It would seem from the foregoing authorities that we may enjoin Arthur from directing the engineers to quit work, for the purpose of coercing the defendant companies to violate the law and complainant's rights. Though we cannot enjoin the engineers from unlawfully quitting, it does not follow that we may not enjoin Arthur from ordering them to do so. An injunction in this form, however, has not been asked, and we need not decide the question.

The rule that equity will not enjoin a crime has here no application. The authorities where the rule is thus stated are cases where the injury about to be caused was to the public alone, and where the only proper remedy, therefore, was by criminal proceedings. When an irreparable and continuing unlawful injury is threatened to private property and business rights, equity will generally enjoin on behalf of the person whose rights are to be invaded, even though an indictment on behalf of the public will also lie. See the cases cited in section 20 of High on Injunctions.

We have thus far considered the right of the complainant to an injunction in an independent suit against Arthur. But the case, as presented to this court, is far stronger. Here a mandatory writ was actually issued against the defendant railroad companies and their employes, restraining them from refusing to interchange with complainant interstate freight. Subsequently Arthur was made a defendant by amendment to the bill, which advised the court that he, as the chief of an unlawful conspiracy to injure the complainant by destroying its interstate business, had just issued, or was about to issue, an order to the engineers in the employ of the defendant companies not to handle complainant's freight, and that, if issued, Arthur's order was more likely to be obeyed than the injunction of the court then in force. Is it possible that, in such a case, a court of equity must remit the complainant to an action at law for the injuries which Arthur's unlawful order will certainly cause, and that the court must await in silence the defeat of its own injunction? The putting of the question answers it. It is the duty of the court promptly to prevent, at all hazards, the probable obstruction to its main injunction, by auxiliary injunctive process, and, if such obstruction has actually been interposed, to remove it by the same means. On this ground the court was fully justified in restraining Arthur, as it did, from continuing in force any order he might have issued in conflict with the previous order of the court. This was mandatory, but it was necessary to secure the enforcement of the court's previous order, and to preserve the status quo. Had the order of Arthur, then in force, been allowed to continue, future equitable relief would have been unavailing. A rescission of the order could work injury to no one. Mandatory injunctions issue under such circumstances. Mr. High states the rule as follows, in his work on Injunctions, (section 2:)

"And when there is a willful and unlawful invasion of plaintiff's right, against his protest and remonstrance, the injury being a continuing one, a mandatory injunction may issue in the first instance."

See Robinson v. Lord Byron, 1 Brown, Ch. 588; Hervey v. Smith, 1 Kay & J. 392; Lane v. Newdigate, 10 Ves. 192; Whitecar v. Michenor, 37 N. J. Eq. 6; Broome v. Telegraph Co., 42 N. J. Eq. 141, 7 Atl. Rep. 851; Beadel v. Perry, L. R. 3 Eq. 465; London & N. Ry. Co. v. Lancashire & Y. Ry. Co., L. R. 4 Eq. 174.

Arthur says that, when he sent out his telegraphic instructions to the members of the brotherhood on March 16th, he had no knowledge of the injunction of this court against defendant companies and their employes issued on the 11th. This is surprising, in view of the interest he had in the subject and the wide publicity given to the injunction. His knowledge of the injunction would be quite material in a proceeding against him for contempt, or in a criminal prosecution of him for conspiring to defeat the administration of justice in the United States courts, (Pettibone v. U. S., ubi supra;) but it was not material here. The fact that his order actually nullified the order of the court, and was continuing to do so, was enough to justify the court in compelling him to rescind it.

The temporary injunction will be allowed, as prayed for.