## AVERILL v. SOUTHERN RY. CO. et al.

(Circuit Court, D. South Carolina. August 28, 1896.)

1. RATE CUTTING BY RAILROADS—INJUNCTION—PARTIES.

In order that a court may take jurisdiction of a suit to restrain demoralizing and ruinous rate-cutting by rival railroad systems, corporations which have leased the railroads of one of such systems, and control the rates thereon, are necessary parties.

2. FEDERAL COURTS—JURISDICTION OF FOREIGN CORPORATIONS.

25 Stat. 433, provides that no civil suit shall be brought in a federal court against any person by any original process or proceedings in any other district than that whereof he is an inhabitant. *Held*, that a corporation of one state cannot be affected by an order or writ or injunction issued by a federal court in another state.

Smythe, Lee & Frost, for complainant.

L. R. Watts, King & Spaulding, W. A. Henderson, J. S. Cothran, Mitchell & Smith, and G. Hatton, for respondents.

SIMONTON, Circuit Judge. This is a bill filed by the receiver of the Port Royal & Augusta Railway Company, asking the aid of the court in protecting the property placed in his charge. This is his right as well as his duty. White v. Ewing, 159 U. S. 39, 15 Sup. Ct. 1018. The bill alleges that a rate war had been inaugurated between the Seaboard Air Line and the Southern Railway Company, two great systems of railroads, which practically control the commerce between the several states lying on the Atlantic coast and the Gulf of Mexico; that one of these systems had begun a cut of 35 per cent. on its rates, with notice that, if this was met by its adversary, a still further cut would be made; that this was met on the part of the other system with a cut of 80 per cent., to go into operation 1st August, 1896; that the immediate and necessary result of this war would be a demoralization of rates, the disturbance and injury of all business within the territory in which it prevailed, as well as all territory directly or remotely connected therewith, and the certain destruction of the railroad property in the hands of the receiver, compelling it to discontinue operations, and to cease to be a going concern. The facts sworn to in this bill show that this rate war was not in competition for business, nor was it intended to promote business by fixing just and reasonable rates, but that it was waged for the purpose of destroying and annihilating all competition, for the demoralization and destruction of all rates, and for the bankruptcy and ruin of one or other of the belligerents; that the reduction was confined to three or four favored points of contact, but that the result worked injury to all other places in the near and remote vicinity of them in which business was conducted, and to all railroads and other carriers within the sphere of these favored places, and especially to the road in his charge; that this action on the part of these two great systems, controlling commerce between so many states, was in dereliction of duty on their part to the public, for whose benefit they were created, and for whose advantage they had been clothed with extraordinary and valuable franchises and great powers; that it violated several sections of the interstate com-

merce law, which are duly set forth (Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730); and that it was an exercise of large capital and extraordinary resources, solely for the purposes of destruction, necessarily impeding, hindering, and obstructing interstate commerce. The bill prayed injunction and subpœna against the Southern Railway Company, the Georgia, Carolina & Northern Railway Company, the Seaboard Air Line, and R. C. Hoffman, its president, E. St. John, its vice president and general manager, and V. E. McBee, its general superintendent, with a number of other railroads in North and South Carolina and Georgia. The questions presented by these allegations did not seek at the hands of the court the regulation of rates, but asked its interference to prevent their demoralization; did not present a case of competition in rates, but of the annihilation of all competition; did not ask the court to intervene between carriers seeking to promote in their own way and to aid interstate commerce, but charged that this commerce was being disturbed and destroyed. Especially, they charged that the purpose was, and the inevitable result of the war of rates would be, the bankruptcy of one or the other of the competitors, and so the end of competition.

The ownership in railroads differs from that in every other species of property. The farmer, the merchant, persons in all other avocations, may manage their own property,—control their own services at their own will. Each may serve or sell to whom he pleases, at such price as he may obtain. He may serve or sell to one man at one price, to another at another price. He may give away his goods, or serve gratuitously, if he chooses. He has only his private interests to subserve. But a railroad is, as it were, public property. 19 Am. & Eng. Enc. Law, 781. Its first duty is to the public. In re Grand Jury, 62 Fed. 844. Its first obligation is the service of the public. Olcott v. Supervisors, 16 Wall. 694. Its owner can refuse service to no one, can discriminate in favor of no one, can show preference neither to persons nor localities. Its charges must always be uniform. In no case can they go beyond that which is just and reasonable, and in the last resort the courts, state or federal, determine what charges are just and reasonable. Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 702; Reagan v. Trust Co., 154 U. S. 397, 14 Sup. Ct. 1047. So overshadowing is this interest of the public that there must be no cessation even for a day in their operation. Barton v. Barbour, 104 U. S. 135. To secure this, the most solemn contract obligations are displaced from their recorded lien in favor of eleventh-hour creditors, whose moneys keep them a going concern. Railroad property is always kept under the control of the legislature and the supervision of the courts. Reagan v. Trust Co., supra. Their performance of their duties to the public, and the observance by them of the statutes made peculiarly for them, will be enforced by all the courts, state or federal.

In view of the great and important questions arising under the bill, which on its face alleged matters within the jurisdiction of this court, its prayer was entertained. A rule was issued on 29th July,

1896, against the corporations and parties complained of, requiring them to show cause on 15th August next thereafter why the prayer of the bill should not be granted. It was charged that great and irreparable injury would immediately follow if this destructive rate war continued. But a few days intervened between the date of the rule and the day the severe cut of 80 per cent. would go into effect, to be followed by a still deeper cut, yet more disastrous. It was thought advisable that there should be a suspension of hostilities, so that matters should remain in statu quo until the grave questions presented could be heard and determined. To this end the usual temporary restraining order was issued, and in a day or two it was modified as to the Seaboard Air Line, so as to bear date 8th August. This was done in compliance with the interstate commerce law. On the day fixed for the return of the rule (15th August), all parties defendant within reach of the process of the court, and H. S. Haines, Esq., commissioner of Southern Freight Bureau, filed their returns and showed cause. Some of the facts stated in the bill were controverted. The jurisdiction of the court over nonresident parties and corporations was denied. Its jurisdiction over the subject-matter complained of was challenged. The right of the complainant to the relief asked was also denied. At the hearing, the attention of counsel was invited, and the argument was restricted, to the question of the jurisdiction of the court.

(1) When a rate war has broken out between two or more great systems controlling a large interstate commerce; when, in the progress of this war, rates are made and changed as the fortunes of the war may require, not competitive, but destructive in their result; when the declared purpose is not the public good, but the defeat and bankruptcy of one or other of the rival systems,—does this state of things warrant the interference of courts, or is it wholly within the control of the legislative branch of the government? (2) In such a case is the relief confined to such parties as are immediately affected by the existence and conduct of the rate war, or can any one indirectly affected or who is injured by the consequences resulting therefrom, in the demoralization of rates, seek and obtain remedy? (3) Are there before the court in the case at bar all proper and necessary parties, whose presence will make any order it may pass herein effective and practical in securing the relief awarded?

The first two questions are of great importance. The destructive results of a rate war waged between two great systems of railroads are recognized and deprecated by men of the greatest ability who have considered the subject. They impair and destroy the usefulness of the railroads themselves, and their ability to serve the public with certainty, efficiency, and safety. The business interests of the community which move the crops and bring supplies to the consumer require that rates be stable. Every precaution has been taken by state legislatures and by the congress to keep them just and reasonable,—just and reasonable for the public and for the carriers. A few favored points and a few persons may for a short

time receive temporary advantage. But the result of such a war is the destruction of values, the disturbance and injury of all business interests, the demoralization and confusion of rates, and great public and private loss. As Judge Cooley has said, the prevention of these rate wars and the disastrous consequences resulting from them is the problem of the age. Whether the powers of courts of equity, state as well as federal, are elastic enough to grapple with the evil; whether the primary trust (the public good) on which railroads hold their property is one which can be enforced in the courts; whether the federal courts are able to meet and to defeat measures which obstruct and tend to destroy interstate commerce, —these are questions which sooner or later must be heard and determined. But, to give effect to such hearing and determination, the cause in which they are heard and determined must have in it all parties necessary to make the determination practical to reach the end desired. Courts do not discuss abstract questions or determine them en thesi.

Are the necessary parties before this court in this case? "Where a decree can be made as to those present without affecting the rights of those who are absent, the court will proceed; but, if the interests of those present and of those absent are inseparable, the obstacle is insuperable." Ribon v. Railroad Cos., 16 Wall. 450. The return of the Georgia, Carolina & Northern Railroad Company, one of the defendants, develops these facts, not theretofore disclosed in the record: That the Seaboard Air Line is not a corporation or a joint-stock company, nor a co-partnership of the several railroads composing it; it is only the designation of a route or line operated and controlled by two corporations, the Raleigh & Gaston Railroad Company and the Seaboard & Roanoke Railroad Company, —one a corporation of the state of North Carolina, the other of the state of Virginia. That the Georgia, Carolina & Northern Railroad company, by authority of the act incorporating it, has leased all of its line and property to these corporations for a long term of years. That, while this corporation keeps up its organization, all the traffic over it, its management, rates, and operation, are controlled by the two corporations who hold the lease. Indeed, the elaborate return of its president to this rule shows that of his own knowledge he knows nothing of the rates charged; that he and his company do not fix them, are not consulted as to them, have no control over them. All that he knows as to the matters charged is on information and belief. He denies, however, that the rates have been reduced for any reason but the fair and legitimate purposes of trade and competition. The two corporations, the Raleigh & Gaston Railroad Company and the Seaboard & Roanoke Railroad Company, are not named specifically in the bill which speaks of the Seaboard Air Line, and are not defendants hereto. If they had been so named as defendants, inasmuch as they are citizens and inhabitants of other states than South Carolina, they could not without their consent be made parties thereto, nor be compelled to answer the bill, nor to abide by the decree of the court herein. Act Cong. 1887, corrected 1888 (24 Stat. 552; 25 Stat. 433). No

civil suit shall be brought before either of said courts, against any person, by any original process or proceeding in any other district than that whereof he is an inhabitant. A corporation is an inhabitant of the state only of its creation. Shaw v. Mining Co., 145 U. S. 453, 12 Sup. Ct. 935. A fortiori, they cannot be affected by an order or writ of injunction which this court may issue, as such writ or order operates only on the person, and the person must be within the jurisdiction.

The controlling question, therefore, is: Are these two corporations, the Raleigh & Gaston Railroad Company and the Seaboard & Roanoke Railroad Company, necessary parties to this bill? Are their interests in its issues inseparable from those of the Georgia, Carolina & Northern Railroad Company, their lessor? The learned counsel for the complainant, in an argument characterized by great learning and exhaustive research, contends that the presence of the Georgia, Carolina & Northern Railroad Company, their lessor, is sufficient for all the purposes of this bill, and a decree against it will bind their lessees, or the system of the Seaboard Air Line. If the Georgia, Carolina & Northern Railroad Company was an independent corporation, in co-partnership with these two corporations, combining with them under a common management, there would be force in this position. But the Georgia, Carolina & Northern is not in any such co-partnership or combination. It is under lease to two corporations controlling the system, without consulting with it. It will be observed, also, that the ground upon which alone relief can be given under this bill is the motive—the purpose —of this war of rates. It goes without saying that this court cannot fix rates; that it cannot interfere in any way in any reduction of rates brought about in legitimate competition; that if any carrier, with the purpose of bringing business to itself, shall reduce and adopt rates for a time not remunerative, but with a view to the accumulation of business, so that it will in time become remunerative, or, indeed, shall adopt any other reduction which it may think of advantage to its business, this court and no court could interfere. It is only when such reduction is made regardless of its own interests, with a view to destroy and defeat its adversary and crush out competition. Steamship Co. v. McGregor, 23 Q. B. Div. 598. Then it is waged as all wars are waged,—for destruction. Then the great powers granted to it by the public, for the public good, are diverted from these purposes, and are used to gratify personal animosity against a rival, to the wrong and injury of the public, that courts, if they can interfere at all, may interfere. This being the case, it would seem that the court should have before it the corporations who are charged with waging this war of rates, whose motives are impugned, whose designs and purposes are to be ascertained, which, if illegal, are to be thwarted. It is not enough to have before it the lessor road, which professes to have no knowledge whatever of such motives and purposes, and which has surrendered all control over the rates. If their motives and purposes are to be investigated, it would seem that they are entitled to be parties to such an investigation. It is true that in South

Carolina (Parr v. Railroad Co., 43 S. C. 197, 20 S. E. 1009) and in many other states, and under the decision of the supreme court of the United States in Railroad Co. v. Brown, 17 Wall. 445, there are cases which hold the company which leases a railroad responsible for the negligence of its lessee, and for the nonobservance of corporate duties. These are cases at law. But even in these cases the judgment goes against the company which owned the road, and not against the company which took the lease of it. Nor can a case be found, nor will any one maintain that under such a judgment an execution can be levied on the goods and property of the company which took the lease, as well as the property of the company which executed the lease. If this case were to proceed, and it be held that the injunction should issue, the Georgia, Carolina & Northern Railroad Company would be restrained from carrying goods at the rates fixed by the Seaboard & Roanoke Railroad Company and the Raleigh & Gaston Railroad Company, its lessees. But its contract, by way of lease, bound it to give control of its rates to these companies, its lessees. The order of injunction, then, would set aside and abrogate this part of the contract, and to this extent would deprive the lessees of their property in the lease; and this order of injunction would be based on the unlawful action or the unlawful purpose of these lessees themselves, not on that of their lessor. Could the court abrogate this lease, annul its terms, deprive these two corporations of their property in it, on grounds like these, without having the lessees as parties in the case? Could the court investigate the conduct of these two lessee corporations, convict them of these grave charges, and deprive them of their property in their absence? Can a decree be made against the Georgia, Carolina & Northern Railroad Company without affecting the rights of the Raleigh & Gaston and the Seaboard & Roanoke? Are not the interests of these two roads and that of the Georgia, Carolina & Northern inseparable? If, so, their absence interposes an obstacle in the way of a decree which is insuperable. Ribon v. Railroad Cos., supra; Machine Co. v. Walthers, 134 U. S. 41, 10 Sup. Ct. 485.

This conclusion has been reached with great reluctance. The importance of the question involved make it desirable that the first step should have been now taken leading to an elucidation of these questions by the court of last resort. The full, elaborate, and able arguments presented at the hearing—arguments the superiors of which are seldom heard—richly deserve a decision on the merits. The temptation to enter upon the discussion of the interesting points involved is very great. But there seems to be no escape from the conclusion reached. The limited jurisdiction of the court stops us at the threshold.