### BARRETT v. CITY OF NEW YORK et al. PLATT v. SAME. WELLS FARGO & CO. v. SAME.

(Circuit Court, S. D. New York. December 21, 1910.)

1. **COMMERCE (§ 33\*)—INTERSTATE COMMERCE—REGULATION—EXPRESS COMPANIES—PACKAGES.**

    Where an express company takes packages of merchandise coming from other states at a railroad or steamer terminal, and transports them by wagon through the streets and avenues of New York to the addressees, such local transportation of interstate packages constitutes interstate commerce, and is therefore within the exclusive jurisdiction of the federal government.

    [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 26, 81; Dec. Dig. § 33.\*]

2. **COMMERCE (§ 61\*)—INTERSTATE COMMERCE—TRANSPORTATION BY WAGONS—USE OF PUBLIC STREETS—REGULATION.**

    That the delivery wagons of express companies operating in New York and using the public streets were engaged in interstate commerce did not make them immune from the operation of general ordinances adopted under Greater New York Charter (Laws 1901, c. 466) § 50, granting to the board of aldermen power to regulate the use of the streets for animals, vehicles, etc., and to make all such regulations with reference to the running of stages, trucks, and cars as might be necessary for the convenient use and accommodation of the streets, etc.

    [Ed. Note.—For other cases, see Commerce, Dec. Dig. § 61.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. INJUNCTION (§ 136*)—PRELIMINARY INJUNCTION—RIGHT TO OBTAIN.**

A preliminary injunction will not be granted unless it is apparent that some irreparable damage to complainants will result if it is postponed until final hearing.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig. § 136.*]

**4. INJUNCTION (§ 137*)—PRELIMINARY INJUNCTION—IRREPARABLE DAMAGE.**

Where certain express companies objecting to the enforcement of city ordinances, requiring licenses for use of wagons on the city streets, could pay the license fees required under protest without inconvenience, and file the required bond, and no serious harm would result from marking the wagons with their license numbers as required, nor from allowing the city officials to inspect their premises and vehicles, they would not suffer apparent irreparable damage by the enforcement of the ordinance and could not therefore obtain a preliminary injunction pending a suit to determine the validity of the ordinance.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 307–309; Dec. Dig. § 137.*]

**5. LICENSES (§ 7*)—USE OF STREETS—ORDINANCES—LICENSING EXPRESS DRIVERS—DISCRIMINATION.**

New York Code of Ordinances, c. 7, art. 3, § 315, regulating the use of hacks and express wagons on the public street, provides that every person driving a licensed hack or express other than the person named in the license taken out therefor, shall be licensed as such driver, and that every application for such license shall be indorsed in writing by two reputable residents of the city of New York, certifying to the competency of the applicant. *Held*, that such section was not invalid as discriminatory, nor was it objectionable in that the class covered was so restricted as to render the ordinance special, in violation of New York City Charter (Laws 1901, c. 466) § 50, requiring the passage of general ordinances only, relating to street traffic, and was not beyond the scope of the city's police power.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 7–15; Dec. Dig. § 7.*]

**6. LICENSES (§ 7*)—EXPRESS DRIVERS—CITY ORDINANCE—CONSTRUCTION.**

New York City Ordinances, c. 7, art. 3, § 315, provides that every person driving a licensed express other than the person named in the license therefor, shall be licensed as a driver, etc. *Held*, that such section only authorizes the issuance or revocation or refusal of a license by the licensing authority in the honest exercise of a reasonable discretion, and that the section was not therefore fatally defective as leaving the question of the applicant's right to a license to the arbitrary and unqualified discretion of the licensing authority.

[Ed. Note.—For other cases, see Licenses, Cent. Dig. §§ 7–15; Dec. Dig. § 7.*]

In Equity. Suits by William M. Barrett, as president of the Adams Express Company, and by Edward T. Platt, as treasurer of the United States Express Company, and by Wells Fargo & Co. against the City of New York and others. On motion for preliminary injunction. Denied.

These are three suits, brought each by a separate express company to restrain the city of New York and various public officers therein from seeking to compel the complainants and their drivers to take out licenses and pay license fees under certain ordinances of the city of New York, on the ground that complainant companies and their drivers are engaged in interstate commerce as common carriers regulated by the interstate commerce act. Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154). The situation

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of each company is substantially the same as that of the others, and the discussion of the cases will be simplified if it be confined to the facts shown in the case first above entitled. The ordinances in controversy will be found in chapter 7, tits. 1, 2, 3, and 4. of the Code of Ordinances of the City of New York (Edition 1910). Such of them as are germain to the issues here involved are referred to in the opinion, and the full text of the more important sections is reproduced either in the opinion or in a footnote.

Guthrie, Bangs & Van Sinderen, for complainant Barrett.

O'Brien, Boardman, Platt & Littleton, for complainant Platt.

Walker D. Hines, Charles W. Stockton, and Alexander & Green, for complainant Wells Fargo & Co.

Archibald R. Watson and Wm. B. Hale, for defendants.

LACOMBE, Circuit Judge (after stating the facts as above). The fairness and conciseness with which the questions at issue have been presented on the briefs, and the frankness with which each side has conceded what is the result of reported decisions bearing upon the general subject-matter of the discussion, has greatly lightened the labor of the court, and has made it unnecessary to undertake any extended review of those authorities. Practically there is no dispute as to the law of the case.

The express company takes packages of merchandise coming from other states at some railroad or steamer terminal, and transports them by its wagons through the streets and avenues to the addresses of the several consignees. It also collects similar packages addressed to consignees in other states from shippers here, and in like manner transports them to such terminals to be forwarded to their respective addresses. It is conceded that the local part of this transportation is an incident of the entire transportation, and that such transportation is interstate commerce. The company also transports to and from points within this city packages not coming from or addressed to points without this state. It is conceded that so much of its business is not interstate commerce. The amount of this domestic business is relatively very small, averaging less than 1 per cent. of its interstate business. With the interstate business only is this court concerned, and in this discussion it will be assumed preliminarily at least that there is no intrastate business to be considered. Not only is the local transportation of interstate packages interstate commerce, and so within the exclusive jurisdiction of the federal government, but that government has actually taken control and regulated such business by express detailed provisions, and by giving to the Interstate Commerce Commission very broad powers of regulation. See the interstate commerce act as amended June 29, 1906 (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1909, p. 1138]), and June 18, 1910. In the course of conducting such business, it is necessary for the express company to make use of the public streets, as a thoroughfare for the passage of the wagons it propels under guidance of its drivers, such wagons becoming a part of the traffic in those streets. That the local authorities have full power, under reasonable regulations, to regulate such traffic is not disputed. The Greater New York Charter (Laws 1901, c. 466) § 50, grants to the board of aldermen power to regulate by general ordinances the use of the streets and sidewalks by foot pas-

sengers, animals, and vehicles; to regulate the speed of vehicles; to. make all such regulations in reference to the running of stages, trucks, and cars as may be necessary for the convenient use and accommodation of the streets, etc.

It is conceded by complainants that the circumstance that their wagons, when using the public streets, are engaged in interstate commerce does not make them immune from the operation of such general ordinances, even though the exigencies of traffic in a congested center of population may induce a very liberal interpretation of this grant of power. The local authorities may find it necessary not only to adopt and enforce "rules of the road," but also to prescribe regulations as to size and weight of vehicles, as to the details of their construction (such as tire width relative to weight), as to their motive power, as to identifying marks and numbers, as to the qualifications of their drivers, as to registration and licensing of vehicles and drivers, as to inspection and oversight. There is no reason, and the court knows of no authority, which will exempt the instruments of interstate commerce from regulations of this sort, adopted for the public safety and convenience, with which other vehicles not engaged in such commerce must comply. It is a legitimate exercise of the police power reserved to the states. Complainants make no contention to the contrary; indeed, they fully concede the proposition above set forth. It is understood, further, that they concede that such fees or charges as may be ratably imposed on all in order to provide the machinery necessary to carry out such regulations cannot fairly be regarded as a tax on interstate commerce, any more than would be the tolls upon a turnpike. On the other hand, it is conceded by counsel for the defendants that whatever authority may be given by law to the local legislature to regulate business generally or to regulate the business of certain specified classes of persons, qua business, is inoperative to control a person engaged in interstate commerce, whose business is already regulated by federal law, since the business of such person is within the exclusive jurisdiction of Congress.

With these concessions in mind we may now turn to the specific ordinances in controversy. The Greater New York· Charter, § 51, provides:

"Sec. 51. Subject to the Constitution and laws of the state, the board of aldermen shall have power to provide for the licensing and otherwise regulating the business of dirt carts, public cartmen, truckmen, hackmen, cabmen, expressmen, car-drivers and boatmen; of boot-blacks, of pawnbrokers, junk-dealers, keepers of intelligence offices, dealers in second-hand articles, hawkers, peddlers, vendors and scalpers in coal freights; of menageries, circuses and common shows; of bone boiling, fat rendering, and other noxious businesses; and shall have power to regulate or forbid the keeping of dogs. The board of aldermen shall also have power to regulate the rates of fares to be taken by owners or drivers of hackney coaches, carriages, motors, automobiles or other vehicles, and to compel the owners thereof to pay annual license fees. All ordinances in relation to any of the matters mentioned in this section shall be general, shall provide for the enforcement thereof in the manner specified in section 44 of this act as amended, and shall fix the license fees to be paid, if any. All licenses shall be according to an established form, and shall be regularly numbered and duly registered as shall be prescribed by the board of aldermen."

The Code of ordinances contains a group of provisions apparently framed under the authority conferred by this section, dealing with the granting and regulation of licenses and being chapter 7 of such Code.

A bureau of licenses is established and organized (Title 1, §§ 300–304), it being provided that all licenses issued by such bureau shall show, among other things, the "privileges allowed." It is next provided in section 305 that:

"The following businesses must be duly licensed as herein provided, namely, public cartmen, truckmen, hackmen, cabmen, expressmen, drivers, junk dealers, dealers in second-hand articles, hawkers, peddlers, vendors, ticket speculators, coal scalpers, common shows, shooting galleries, bowling allies, billiard tables, dirt carts, exterior hoists and stands within stoop-lines and under the elevated railroad stations."

A penalty of not less than $2, nor more than $25, for each offense is imposed upon any person "who shall engage in or carry on any such business without a license therefor." Section 306. The term of the license and its suspension or revocation are provided for in section 307, and the amount of annual license fees is provided in section 308 (printed in footnote infra), a separate fee is charged for each cart, hack, or express wagon, which is a convenient method of making the tax imposed conform to the amount of business done, there being in like manner a separate fee charged for each table in a billiard room and for each chair in a bootblack stand. Renewals of licenses are provided for in section 309.

The next article (3 [sections 310–360]) deals with special regulations and rates. Under the first three subdivisions (sections 310–329) are grouped "public carts and cartmen," and "public hacks and hackmen." A "public cart" is defined by section 310 as "every vehicle of whatever construction, drawn by animal power or propelled by other motive power, which shall be kept for hire or used to carry merchandise, household furniture, or other bulky articles within the city of New York for pay." The owner thereof is declared to be a "public cartman." There is no separate provision in the Code for "truckmen," enumerated in section 51 of the charter and in section 306 of the ordinances. Evidently it was assumed that there was no real distinction to be drawn between a cart and a truck. It is provided that every public cart shall show on each outside thereof identifying marks and an official number (section 311); and that the amount to be charged for loading, transportation, and unloading may be agreed upon in advance, and such contract shall control (section 312). The legal rates "for moving household furniture," unless otherwise mutually agreed, are prescribed in section 313 (printed in the footnote), but there seems to be no prescribed rates for articles not properly "household furniture." To secure payment of his "legal rate of transportation," a public cartman is given a lien, and provision made as to enforcing it (section 314).

Section 315 provides that:

"Every person driving a licensed hack or express, other than the person named in the license therefor, shall be licensed as such driver, and every ap-

plication for such license shall be indorsed, in writing, by two reputable residents of the city of New York certifying to the competence of the applicant."

Subdivisions 3 and 4 (sections 316–329) regulate "public hacks and hackmen"; the word "hacks" including both "cabs" and "coaches" for transporting persons, and the term "hackmen" including owner or driver, or both (section 316). There are provisions as to hackstands and the use thereof. The legal rates of fare for cabs and coaches, both mileage and hourly, are specifically fixed, with right to exact payment in advance. We find provisions for marking and numbering the vehicles, for the disposition of property lost or left therein, and for the settlement of disputes as to the lawful rate of fare, where no agreement has been made.

Section 325 provides that:

"All vehicles for hire shall be licensed, and the owner thereof shall pay the sum of two dollars with his original application as the license fee for each and every vehicle so kept for hire and one dollar for each vehicle for annual renewals."

It is difficult to see to what "vehicles for hire" this can apply, in view of the specific provisions as to "public carts," "public hacks," and "public expresses" found elsewhere in the chapter. Possibly it may apply to vehicles supplied to customers by livery stables.

Subdivision 4a (sections 329a to 329k) deals with public porters, requiring licenses and the wearing of a badge, and regulating the manner in which they shall conduct their business, and the rates they may charge.

Subdivision 5 deals with expresses and expressmen. It reads as follows:

"Sec. 330. Every vehicle of whatever construction kept or used for the conveyance of baggage, packages, parcels and other articles within or through the city of New York for pay, shall be deemed a public express, and the owner thereof shall be deemed a public expressman, and the term expressman shall be deemed to include any common carrier of baggage, packages, parcels or other articles within or through the city of New York.

"Sec. 331. Every public express shall show on each outside thereof the word 'Express,' or the letters 'Exp.' together with the figures of its official number.

"Sec. 332. Every owner of a public express shall give a bond to the city of New York for each and every vehicle licensed in a penal sum of $100 with sufficient surety, approved by the mayor or chief of the bureau of licenses, conditioned for the safe and prompt delivery of all baggage, packages, parcels and other articles or things entrusted to the owner or driver of any such licensed express.

"Sec. 333. The legal rates for regular deliveries, unless otherwise mutually agreed, shall be as follows in the city:

"Between points within any borough:

Not more than five miles apart, each piece.....................$ 0 40
Not more than ten miles apart, each piece.....................   55
Not more than fifteen miles apart, each piece.................   75

"Between points in different boroughs: One-half the above rates in addition.

"Special deliveries at rates to be mutually agreed upon."

In subdivisions 6 to 16 (sections 334–359) are found provisions regulating in more or less detail the following businesses: Junk dealers,

dealers in second-hand articles, peddlers, ticket speculators, coal scalpers, common shows, shooting galleries, bowling alleys, billiard tables, dirt carts and cartmen and exterior hoists. Article 4 deals with stands within the stoop lines and under elevated railroad stations.

Title 3 (sections 373-378) deals with general regulations and complaints, license fees received from hackmen, dealers in junk and secondhand articles, and for stands within stoop lines are to be paid into the sinking fund, and all other license fees into the city treasury. All licensed vehicles and places of business shall be regularly inspected. Section 374 (printed in the footnote). Licenses must be exhibited on demand; the identifying marks prescribed for licensed vehicles are to be permanently and conspicuously affixed; fines of not more than $5 may be imposed by the chief of the bureau of licenses. Further penalties for violation of the regulations are provided in section 379 printed in the footnote.

A few preliminary points which have been raised may be first disposed of. It has been suggested that the form, arrangement, and language of the group of ordinances above cited indicate that the board of aldermen which passed them was undertaking to exercise the power conferred by section 51, and was not acting under section 50 of the charter. This may be so, but it is not material to inquire into the mental processes of the members of a past and gone legislative body. If some one or more of its enactments are such as it had authority to pass under some specific grant of power, it will not fail because it was voted for under the supposition that authority was given under some different grant of power, not broad enough to warrant such enactment.

It is shown that for years past and with these ordinances in the Code the express company has not (until just prior to the bringing of this suit) been required to take out licenses for the conduct of its interstate business, or to employ only licensed drivers for its wagons engaged in interstate commerce, or to conform to any tariff charges prescribed, nor has there ever been any inspection of its premises or vehicles. It has, however, taken out licenses for wagons and drivers engaged in conducting its intrastate business. This indicates a practical construction of the ordinances in consonance with complainants' interpretation of them, which might help to turn the scales in a doubtful case, but which certainly cannot control, if some particular ordinance is found to be valid and applicable.

This discussion is much simplified by the manner in which it comes up. The application is for a preliminary injunction. Such relief is not granted unless it is apparent that some irreparable damage to the complainant will result if it is postponed till final hearing. As to nearly all the provisions complained of no such damage is shown. The amounts of license fees prescribed for wagons and drivers may be paid, under protest, without inconvenience, and no irreparable damage will result from filing the bonds required; no harm will result from marking the wagons with their license numbers, or from allowing the city officials to inspect premises or vehicles. No attempt has been made to regulate the rates to be charged and collected for transporta-

tion of interstate packages, nor is any such attempt threatened. The defendants concede that where such rates are not disapproved by the Interstate Commerce Commission the city authorities have nothing to do with them.

It does appear, however, that if the provisions requiring all express wagons to be driven only by drivers licensed as required by section 315 are enforced, the ability of the express company to discharge its duties as a common carrier engaged in interstate commerce may be seriously interfered with. A determination, therefore, of the questions raised as to this section is appropriate at this stage of the case. That section requires that the drivers of certain vehicles therein specified must be licensed, which is calculated to insure their identification, and that their application for license must be accompanied by a certificate in writing by two reputable residents "to the competence of the applicant," which to some extent, however slight, would tend to secure more careful drivers. If this ordinance were enacted under section 50 of the charter, and by its terms applied to all persons driving vehicles in the streets, complainants, on their own statement, would not be here asserting immunity from its provisions. As we have seen it makes no difference under which section of the charter the board of aldermen undertook to act. If the ordinance is such as they were authorized to enact under any section, and they have enacted it, it will stand. The only question is whether the particular ordinance is so special that it must fall, either because it is not a "general ordinance," which alone is authorized by section 50, or because it makes discriminations not to be tolerated under the fourteenth amendment to the Constitution of the United States.

Obviously the ordinance is not of universal application; it does not require the drivers of all vehicles to be licensed after a certification as to competency. No doubt it would be a great boon to pedestrians who have to use the streets if such a measure of protection against reckless driving were secured to them, but this ordinance does not go to any such length. It deals only with a relatively small class of drivers. As we have seen, the only carts which are required to be licensed are those used by their owners to transport the goods of other persons for pay. Section 310. Inasmuch as all licensed vehicles are required to be conspicuously marked, a few hours' walk through the business thoroughfares of the city will give some idea of the relatively small number of vehicles which are within the terms of the ordinances. All carts and trucks used by wholesale dealers, by building contractors, breweries, department stores, and in a host of other employments—some of them of larger size and a greater menace than any operated by public cartmen or expressmen—are wholly without the purview of this ordinance.

It may be that the class covered by this ordinance is still further restricted. The ordinance is limited in terms to "every person driving a licensed hack or express." By definition (sections 310–316) the "public cartmen" whose vehicle must be licensed in operating neither a hack nor an express, so that section 315 does not require the person·

driving his vehicle to be licensed. Section 308 provides that the annual license fee for each driver of any licensed vehicle shall be 50 cents, but that may fairly be construed as prescribing only the amount which shall be paid by drivers who are required to be licensed; what drivers shall be licensed being provided for elsewhere. If this construction be correct the only drivers of carts for the conveyance of goods who are required to be licensed are those who drive express wagons; the drivers of the public carts of "public cartmen" are immune. Such a construction, however, is somewhat doubtful, and since no such interpretation is contended for by the complainants, it will be assumed for the purposes of this case that section 315 requires licensed drivers for all public hacks and for all carts or wagons whose owners carry articles owned by others for pay.

This class, which includes the truckmen, cartmen, expressmen and hackmen, is apparently a small one, relatively to the total traffic in the streets; but it is not a class arbitrarily constituted, the line of cleavage between it and the residue of the traffic carried on by owners of the vehicles transporting their own property and persons is a natural one. It is quite conceivable that some good reason may be shown for a separate classification. It is suggested on defendant's brief that the drivers of the one class are readily differentiated from those of the other classes by the circumstance that they name the charges for service to customers, collect the amounts due, and may contract in some instances for special rates. However this may be, the federal courts are not astute to find improper classification where the state has undertaken, in the exercise of its police power, to differentiate between different classes. There must be a very clear showing of inequality (as in Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220) to warrant their interposition. In the case at bar this court is not now prepared to hold that the discrimination between the drivers provided for in section 315 and all other drivers is so arbitrary as to require the condemnation of the section under the fourteenth amendment. As to the suggestion that chapter 50 of the charter forbids the passage of special ordinances, it is sufficient to say that an ordinance covering all instances of a certain class may be a "general" one, although it may not be universally applicable to all classes.

It is further suggested that the section should be condemned because it leaves the question, who shall be licensed, to the arbitrary and unqualified discretion of the mayor, who may revoke any driver's license at his own will, without assigning any reasons for such action. Section 307. A similar objection was raised before this court in Engel v. O'Malley (opinion filed August 31, 1910) 182 Fed. 365. There a statute was criticised because it apparently confided the issuing of a license to the arbitrary discretion of the State Comptroller. Of this criticism it was said:

"It is sufficient to say that the terms (of the statute) may be construed either way; that is, as giving such officer the power capriciously to refuse a license, or as giving him the power to refuse only in the honest exercise of a reasonable discretion. In the absence of a decision by the state court of last resort construing the language of the statute, it must be assumed that

the latter is the correct interpretation, because otherwise the act would be unconstitutional, and it must be assumed that the Legislature intended to keep its enactments within the limits fixed by the Constitution."

The motions are denied.

### NOTE.

The following sections of the ordinances, which are cited in the foregoing opinion, are printed in full in this footnote, for convenience of reference:

Sec. 308. The annual license fees shall be as below enumerated:

| | |
|---|---|
| For each public cart or truck...................................$ | 2.00 |
| For each public hack coach...................................... | 3.00 |
| For each public hack cab....................................... | 2.00 |
| For each special hack coach.................................... | 5.00 |
| For each special hack cab...................................... | 3.00 |
| For each express wagon......................................... | 5.00 |
| For each junk shop or dealer................................... | 20.00 |
| For each dealer in second-hand articles........................ | 25.00 |
| For each junk cart or ·boat.................................... | 5.00 |
| For each peddler using horse and wagon......................... | 8.00 |
| For each peddler using push cart.............................. | 4.00 |
| For each peddler carrying merchandise.......................... | 2.00 |
| For each ticket speculator..................................... | 50.00 |
| For each coal scalper.......................................... | 250.00 |
| For each common show........................................... | 25.00 |
| For each public shooting gallery.............................. | 5.00 |
| For each public bowling alley................................. | 5.00 |
| For each public billiard table................................ | 3.00 |
| For each dirt cart............................................ | 1.00 |
| For each general hoisting...................................... | 25.00 |
| For each special hoisting...................................... | 1.00 |
| For each fruit or soda water stand, or both.................... | 10.00 |
| For each newspaper or periodical stand, or both, and in addition also fruit or soda water, or both.............................. | 15.00 |
| For each movable newspaper stand.............................. | 1.00 |
| For each newspaper and periodical stand, or both..:........... | 5.00 |
| For each chair of a bootblack stand........................... | 5.00 |
| For each stand under elevated railroad stations................ | 10.00 |
| For each driver of any licensed vehicle....................... | .50 |

Sec. 313. The legal rates for moving household furniture, unless otherwise mutually agreed, shall be as follows:

| | |
|---|---|
| For a single truck load, within two miles.......................$ | 2.00 |
| For every additional truck load, within two miles................ | .50 |
| For loading, and unloading and housing to ground floor......... | .50 |
| For each flight of stairs, up or down.......................... | .25 |
| For a double truck load, within two miles...................... | 3.00 |
| For every additional mile or part thereof...................... | 1.00 |
| For loading, unloading and housing to ground floor.............. | .50 |
| For every flight of stairs, up or down......................... | .50 |

Sec. 374. The mayor shall have power to appoint inspectors in the bureau of licenses to see that the provisions of this ordinance are fully and properly complied with; and all licensed vehicles and places of business shall be regularly inspected, and the result of such inspection shall be indorsed on the official license therefor, together with the date of inspection and the signature of the inspector, and all inspections shall be regularly reported to the bureau of licenses.

Sec. 379. Except as hereinbefore otherwise provided, no person shall violate any of the regulations of this ordinance under a penalty of not less than two dollars or more than ten dollars for each offense. No such violation shall be continued under a penalty of one dollar for each day so continued. Any

person engaging in or carrying on any business herein regulated without a license therefor, or any person violating any of the regulations of this ordinance, shall be deemed guilty of a misdemeanor, and upon conviction thereof by any magistrate, either upon confession of the party or competent testimony, may be fined not more than two dollars ($2) for each offense, and in default of payment of such fine may be committed to prison by such magistrate until the same be paid; but such imprisonment shall not exceed ten days.