# FORTUNA ESTATES, Plff.,

*v.*

# EMILIA V. HENNA ET AL., Dfts.

San Juan, Equity, No. 970.

PRELIMINARY INJUNCTION.

Equity—Preliminary Injunction—Notice to Opposite Party.

1. Though equity rule 73 provides that notice of the application for a preliminary injunction be given the opposite parties, this means such parties as are before the court, and not absent defendants, and the court has jurisdiction to grant a preliminary injunction without waiting for such defendants to be notified by publication.

Equity—Necessary Parties.

2. The People of Porto Rico is not a necessary party to a suit between two other parties who have conflicting irrigation contracts with the People of Porto Rico.

Equity—Preliminary Injunction—Irreparable Injury.

3. All that is needed for a preliminary injunction is to satisfy the court that a cause of action exists, and that irreparable injury will result unless the preliminary injunction is granted; while a preliminary injunction should be cautiously used, it should not be withheld when, in the exercise of a sound judgment, it is necessary to prevent injustice; it rests largely in the sound discretion of the trial court; depriving sugar-cane fields of irrigation water constitutes irreparable injury.

Equity—Preliminary Mandatory Injunction.

4. While preliminary injunctions are usually preventive, the court has power to grant a preliminary injunction mandatory in form if it administers proper preventive relief.

Equity—Preliminary Injunction.

5. In order to justify a preliminary injunction the right must be clear and the facts definitely ascertained.

Fortuna Estates v. Henna.

Same.

      6. The court will not pass upon the merits of the case when provisionally presented upon a motion for a preliminary injunction, if there is enough otherwise before the court to determine the injunction question.

Same.

      7. The office of a preliminary injunction is to preserve the *status quo* until a final hearing; *held* that plaintiff has made out a case entitling it to a preliminary injunction.

Opinion filed May 18, 1916.

_____

## Statement of Facts.

This is an application for a preliminary injunction to restrain the defendants from taking certain water from the Jacaguas river above what is called the Aruz pump of the plaintiff. The bill, which was sworn to, was filed April 7, 1916, and alleges that the plaintiff is a corporation owning certain four tracts of land in the municipality of Juana Diaz, and has as appurtenant thereto, by virtue of concessions, decrees and user, the right to use the waters from the Jacaguas river for the irrigation of these lands, to wit:

(1) One tract known as the estate "Fortuna," comprising approximately 312.07 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof 139.75 liters of water per second, equivalent to 3,572.910 acre feet of water per year for said estate "Fortuna."

(2) One tract known as the estate "Cristina," comprising approximately 308.14 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof

106.74 liters of water per second, equivalent to 2,728.969 acre feet of water per year for said estate "Cristina."

(3) One tract known as the estate "Luciana," comprising approximately 243.58 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof 82.54 liters of water per second, equivalent to 2,111.142 acre feet of water per year for said estate "Luciana."

(4) One tract known as the estate "Serrano," comprising approximately 219.15 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof 102.47 liters of water per second, equivalent to 2,619.769 acre feet of water per year for said estate "Serrano."

That the plaintiff and its predecessors had been for upwards of twenty years taking this water, being water received through artificial intakes which it had built, and also torrential waters from the bed of the Jacaguas river without limit. That under a public irrigation law approved September 18, 1908, and amended, the People of Porto Rico had constructed an irrigation system on the south side of the Island, and as a part thereof impounded a part of the waters of said river by a dam, known as the Guayabal dam, above these intakes, and on August 26, 1914, through its acting commissioner, E. S. Wheeler, made a contract with plaintiff, whereby, in place of the water before used by plaintiff, it was agreed that certain regular daily deliveries of water should be made to plaintiff as follows: For the estate Fortuna, 9.06 acre feet daily; for the estate Cristina, 3.59 acre feet daily; for the estate Luciana, 3.45 acre feet daily; and for the estate Serrano, 6.52 acre feet daily, of which 571.27 acre feet per year was to be delivered at the point or place in the bed of said river known as Aruz intake; that said contract

also provided that said plaintiff should take from the Jacaguas river by pump at said Aruz intake so located all further water in the Jacaguas river available there except that necessary to fulfil the subsisting water rights or concessions upon the said river at points below the said Aruz pump, provided, however, that, if the People of Porto Rico at any time thereafter undertook the development and utilization of the so-called surplus waters of the Jacaguas river, this right to take additional water should be limited to a maximum amount of 3.86 second feet.

This was a private agreement, but by its terms could be converted into a notarial instrument, which was accordingly done June 8, 1915, and signed by Manuel V. Domenech as Commissioner of the Interior of the People of Porto Rico, and by the plaintiff.

It is further alleged that defendants Rafaela Castillo Veitia, Viuda de Cabrera, and María Cabrera and Enrique Cabrera are together the owners in undivided shares of an undivided one-half interest in a certain tract of land situated in the municipality of Juana Diaz, Porto Rico, known as Boca Chica, and that defendant Manuel Leon Parra is the attorney in fact of the defendants Emilia V. Henna, viuda de Cabrera, and Gustavo M. Cabrera y Henna, and is the manager or administrator of the Central Boca Chica, a sugar mill located on the property above described. These defendants have been served and have filed an answer. The other defendants are not yet served, but an order of publication is running against them.

That defendant Parra, as attorney in fact for the respondents, on December 14, 1915, entered into a contract with the said Domenech as Commissioner of the Interior, for the use of certain waters of the Jacaguas river, against which contract, before

VIII. Porto Rico—41.

its approval by the Executive Council, plaintiff protested. The defendants' contract, however, was ratified, and they have reconstructed the intake of their Maturi and San Fernando canals above the Aruz pump for the purpose of obtaining the delivery of water under said pretended new contract, and that use of these two canals and intakes deprived the plaintiff of the water at the Aruz intake to which it is entitled.

Plaintiff alleges that its water has thus been diverted and will be diverted, and plaintiff prevented from obtaining it, in violation of its contracts and rights, and that such action of the defendants causes irreparable damage to the plaintiff in the cultivation of sugar cane on the four properties above described. Wherefore a preliminary injunction is prayed, to be made permanent at the final hearing, together with other and further relief.

A separate answer is filed by defendants Rafaela Castillo Veitia, María Cabrera, and Francisco Parra on April 17, 1916. It was sworn to by the first two defendants named. It admits many of the allegations of the bill, but denies that defendants are infringing any legal rights of the plaintiff. It also alleges certain defect of parties. The bill set out the contract under which the plaintiff claims, accompanied by a map and certain other exhibits, and the answer set out the contract of August 26, 1914, called the Boca Chica and Fernando contracts, under which defendants claim. The contracts are of the same general nature with certain exceptions to be noted.

The defendants' contract covers (1) one tract known as estate "Boca Chica," composed of approximately 345.41 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof 133.26 liters of water per second,

equivalent to 3,409.72 acre feet of water per year for the estate Boca Chica; (2) one tract known as estate "San Fernando," comprising approximately 75.54 hectares of land, with an appurtenant right to take from the river Jacaguas for the irrigation thereof 52.88 liters of water per second, equivalent to 1,-350.50 acre feet of water per year for said estate San Fernando; and provides for delivery of water thereto as follows: For the estate Boca Chica 2,915.53 acre feet per year; for the estate San Fernando 566.40 acre feet per year. The waters to be delivered shall be delivered subject to the conditions hereinbelow expressed, in substantially equal quantities from day to day, to wit:

For the estate Boca Chica 7.98 acre feet daily; for the estate San Fernando 1.55 acre feet daily. Except in the case of shortage of water in the reservoir behind the Guayabal dam, hereinbefore provided for, the water deliverable hereunder for the estates of Boca Chica and San Fernando shall be delivered at the present intakes of the respective estates, or may at the option of the irrigation service be delivered at any useful part of the canals of said estates.

There is a separate answer of Manuel Leon Parra, filed also April 17, admitting that he is attorney in fact of defendants Emilia V. Henna and Gustavo M. Cabrera and manager of Central Boca Chica, and that he executed the contract of December 14, 1915, as such.

The matter of preliminary injunction was submitted upon bill and answers, and on affidavits for plaintiff of F. T. Maxwell as general manager of the Fortuna estates, and R. L. Hanson as superintendent of Central Fortuna, and for the defendants

on the affidavit of James M. Beardsley, chief engineer of the irrigation service.

The affidavits of Maxwell and Hanson show that the Aruz intake is on the west bank of the Jacaguas river, and that above it on the opposite side are located the Maturi pool and canal and the old San Fernando intake, while below the Aruz intake is the Fernando-Boca Chica intake of the hacienda Boca Chica. The Boca Chica property, therefore, is on the east side of the Jacaguas river and the Fortuna property, at least in part, on the west side of that stream. For a long time prior to May 3, 1915, the Maturi canal and old San Fernando intake had been closed, and the rights of the hacienda Boca Chica had lapsed and been relinquished. On that date there was at Ponce a meeting of the irrigation syndicate of the Jacaguas river, and defendant Parra, on behalf of the hacienda Boca Chica, asked authority to open the intake of an old canal situated a little above the Maturi pool so as to receive the torrential waters. This was agreed to on the understanding that Boca Chica should put this canal in condition "to receive said waters in the way and form agreed to." On January 24, 1916, defendant Parra erected an earthen dam in the Jacaguas river above the Aruz intake, and thereby the Maturi canal received water not torrential, this being done by virtue of a contract with the Commissioner of the Interior on December 14, 1915, made exhibit "B" to the bill in this cause. This taking of water was intended as a purchase thereof at $6 a day on certain conditions, including reconstruction of the intake of the Maturi canal. This contract expressly provides that it "shall in no way modify or change the provisions of prior contracts involving water concessions on the Jacaguas river," nor be construed as restoration of former water rights

pertaining to the Maturi canal. This agreement was also subject to the approval of the Executive Council. The dam in question was demolished by Superintendent Hanson, rebuilt by defendant Parra, and again demolished. On February 2, 1916, Commissioner Domenech held that no permit had been given for such dam, and it has not been re-established. Plaintiff protested against the defendants' contract, but it was approved by the Executive Council February 14, 1916. And defendants reconstructed the Maturi canal and old San Fernando intake, and for a period of time thereby obtained surplus waters of the Jacaguas river. On February 3, 1916, approximately 30 per cent of the water coming down the Jacaguas river was diverted by means of the Maturi canal and on the left against the intake to the hacienda Boca Chica. They are not now in use because of the low water in the river. The Fortuna estates are devoted in the maximum acreage possible to the cultivation of sugar cane, and need more water than they receive from the schedule agreed on in the contract with the People of Porto Rico. Indeed new regulations of the irrigation service allow the priority of purchase of surplus waters to lands within the irrigation district which pay a tax, and, as the Fortuna estates corporation is not in this class, having its rights under concessions, the plaintiff will not receive the water which it has heretofore purchased and stored in reservoirs upon its estates.

Chief Engineer Beardsley says that the water due the Aruz pump is now being delivered by the irrigation service at other points in accordance with agreements, and that no water has been delivered to the Maturi canal or for its account at any place since February 8, 1916. That the Maturi canal is about 800 or a thousand feet up the Jacaguas river from the Aruz

Fortuna Estates v. Henna.

pump. Beardsley thinks that the irrigation contracts of the plaintiff and defendants do not interfere with each other, and that the interest of the People of Porto Rico and the irrigation service would be seriously injured if the court determine that the Boca Chica contract was not valid, as it would affect the sale and disposal of surplus and excess waters at other points along the Jacaguas river. He does not ask, however, in his affidavit to intervene on behalf of the irrigation service, nor is there any formal application for that purpose on behalf of the irrigation service or of the People of Porto Rico.

*Mr. Francis E. Neagle* for plaintiff.

*Messrs. Francisco Parra* and *Chas. Hartzell* for respondents.

HAMILTON, Judge, delivered the following opinion:

Before discussing the merits of the case, it is necessary to consider preliminary objections as to parties and the nature of the relief sought.

1. It is alleged by the respondents that they own only the reversion of one half of the property, and that the other owners are not yet made parties. Equity rule 73 is invoked to show that notice of an application for preliminary injunction must be given to the opposite parties. It does not seem, however, that this is applicable. In some cases a preliminary injunction could not be obtained in time to do any good if the plaintiff had to wait for absent defendants to be brought in by publication. The rule must be construed as relating to parties who are in court. And, moreover, the parties who are in court seem to

be the substantial defendants. Defendant Parra may not be an owner, but he is a proper, if not a necessary, defendant in that he is the active representative of the absent defendants, is in the actual control of the properties to which it is alleged the water is being diverted, and is the very person by whom the obstructions complained of were placed in the Jacaguas river, which resulted in the diversion of the water. The office of a preliminary injunction is to preserve the *status quo* until the court may grant permanent relief upon the final hearing. It does not appear that anything except a continuation of the alleged injury will be effected by waiting until other defendants are made parties.

2. The same is true of the contention that the People of Porto Rico or the Commissioner of the Interior should be named as a party defendant. The People of Porto Rico have been held in civil cases to be quasi sovereign so far as concerns process of courts, and a delicate question would arise as to making them a party. It is probably true that the same result would follow in making the Commissioner of the Interior a party, inasmuch as he would come in in a purely representative capacity as representing the People of Porto Rico. However this may be, it is not necessary. The plaintiff has or has not certain rights under its contract with the People of Porto Rico, and these rights will or will not be enforced, as the case may be. The People of Porto Rico have not put obstructions in the Jacaguas river or rebuilt intakes in such a manner as to take off water which belongs to the plaintiff. The People of Porto Rico have authorized the defendants so to do, but the act of the defendants was their act alone. Whether they can call on the People of Porto Rico to defend the suit is a matter which does not at

present arise. Somewhat the same question was presented in the suit of Insular Dock Co. v. P. J. Carlin Constr. Co. ante, 24, where conflicting contracts had been made by the Secretary of War. It was there held that it was a question of existing rights, regardless of the source from which those rights were obtained, and that litigation should proceed between the private parties claiming those rights. While not the same, it is not unanalogous to a case where legal rights are derived directly from the government, as in the case of conflicting patents. The litigation here, however, is not between a party and the government, but between the individuals having the conflicting claims. There is no reason in such case for joining the government as a party, even if the government were subject to suit. If the government should seek to intervene, its application would be carefully considered.

3. The object of the bill in this cause is to restrain certain acts which are alleged to result in irreparable damage to the plaintiff. The damage complained of is injury to plaintiff's growing sugar cane, upon which depends the value of the property involved in this litigation. Theoretically it might be possible to compensate the plaintiff for such loss by the payment of money, but practically it is not possible to do so. Almost all property in the world can be estimated in money value, but this does not change the fact that for all practical purposes damage to property sometimes is irreparable in the eye of the law. Where the main object of its use is prevented the damage may well be irreparable. Where there will be a destruction of the element which makes the property of value, the damage will be irreparable. California Pastoral & Agri. Co. v. Enterprise Canal & Land Co. 127 Fed. 741. In the case at bar the land

obtains its value from the raising of cane for the manufacture of sugar, which is the main industry of Porto Rico, and apparently the sole industry of the plaintiff. The business interrelations growing out of the sugar industry, both as to colonos and employees on the one side, and as to American and other business houses to whom the product is to be shipped on the other, make up a commercial network, for whose breaking the courts would be powerless to estimate and award damages. This constitutes irreparable damage in the eye of the law. In the case at bar the answer does not expressly deny this allegation of the bill; but by setting up that the same injury will accrue to the defendants by similar deprivation of water, it practically admits the claim of the plaintiff that the same result will accrue to itself.

All that is needed for a preliminary injunction is to satisfy the court that a cause of action exists, and that irreparable injury will result unless the preliminary injunction is granted. Irving v. Joint Dist. Council, U. B. C. & J. 180 Fed. 896, 900; Barrett v. New York, 183 Fed. 793, 799. While a preliminary injunction should be cautiously used, it should not be withheld when in the exercise of a sound judgment it is necessary to prevent injustice. Continuous Glass Press Co. v. Schmertz Wire Glass Co. 82 C. C. A. 587, 153 Fed. 577, 578. A preliminary injunction rests largely within the sound discretion of the trial court, especially where the defendant can be fully protected against loss by a bond to be given by the plaintiff. Railroad Commission v. Texas & P. R. Co. 75 C. C. A. 226, 144 Fed. 68, 73.

4. The preliminary injunction sought in this case is of the class known as mandatory; that is, it would command the de-

Fortuna Estates v. Henna.

fendants to undo something that they had done, to restore the water user to what it was before they made their improvements at their own intakes. Ordinarily preliminary injunctions are preventive. Mandatory injunctions are seldom allowed before a final hearing. Corning v. Troy Iron & Nail Factory, 40 N. Y. 191. Nevertheless mandatory injunctions are sometimes granted, and indeed the term applies more especially to interlocutory injunctions. Where by final decree matters are restored to their original status, it is more properly called an abatement than an injunction. A mandatory injunction resembles in effect the restorative interdict of the Roman law, and is used where the injury is immediate, pressing, irreparable, clearly established by the proofs, and not acquiesced in by the plaintiff. Preliminary mandatory injunctions have been granted more freely by the English than by the American courts, but they will be granted if they administer proper preventive relief. 3 Pom. Eq. Jur. § 1359. In Robinson v. Byron, 1 Bro. Ch. 588, Lord Thurlow granted a preliminary injunction restraining defendant from maintaining dams to prevent water from flowing to plaintiff's mill as it had done. This necessitated the removal of these dams. The ruling American view on the subject is expressed by Mr. Circuit Judge Taft in Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co. 19 L.R.A. 387, 5 Inters. Com. Rep. 522, 54 Fed. 730, a well-considered case arising out of the Debs strike of 1893. In that case (p. 741) he says: "The office of a preliminary injunction is to preserve the *status quo* until, upon final hearing, the court may grant full relief. Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the *status quo* is a condi-

tion not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant, which he appeals to a court of equity to protect him from. In such a case courts of equity issue mandatory writs before the case is heard on its merits." This point was taken by Lennon to the Supreme Court of the United States, and that court, through Mr. Justice Brown, said: "There could be no doubt of the power of the court to grant this injunction, which bore solely upon the relations of the railway companies to each other. It was alleged in the bill to have been a part of the regular business of the defendant roads to interchange traffic with the Ann Arbor road, and the injunction was sought to prevent an arbitrary discontinuance of this custom. Perhaps, to a certain extent, the injunction may be termed mandatory, although its object was to continue the existing state of things, and to prevent an arbitrary breaking off of the current business connections between the roads. But it was clearly not beyond the power of a court of equity, which is not always limited to the restraint of a contemplated or threatened action, but may even require affirmative action, where the circumstances of the case demand it. Re Lennon, 166 U. S. 548, 556, 41 L. ed. 1110, 1113, 17 Sup. Ct. Rep. 648."

While a mandatory injunction may be less common, if appropriate to the facts of the case it will be granted. The point for consideration is less the form of the writ than the remedy called for by the facts of the case. A writ of this character was lately granted by this court in De Diego v. Rovira, 9 P. R. 17.

5. The sole object of an interlocutory injunction is to preserve the subject in controversy, and, without determining any questions of right, to prevent the further perpetration of wrong,

or any act whereby the right in controversy may be materially endangered. It cannot be used for the purpose of taking property out of the possession of one party and putting it in the possession of another, nor for ordering defendant to undo something apt to produce injury to the defendant, such as the plaintiff complains of having suffered. High, Inj. § 4. The object of a preliminary injunction is to prevent irreparable injury by preserving things in their existing condition or the condition which has been existing until disturbed by the defendant himself. Such an injunction will not be granted where it appears that the plaintiff's right is not clear, and that there are substantive matters of defense which should not be tried on *ex parte* affidavits, especially if, as in the case at bar, the defendant is financially responsible. Paine v. United States Playing-Card Co. 90 Fed. 543. As it is sometimes expressed, the rule in the Federal courts is that a preliminary injunction will not be granted unless the papers present a clear case. Star Co. v. Colver Pub. House, 141 Fed. 129. The plaintiff must show that there is no doubt of the wrong sought to be enjoined, or that its claim of right has been long acquiesced in. 1 Foster, Fed. Pr. 3d ed. p. 498. The right must be clear and the facts definitely ascertained in order to justify a preliminary injunction. High, Inj. § 881.

6. The bill of complaint, which is sworn to and supported by affidavits, alleges that the plaintiff had been long in the exercise of certain water rights, acquired by royal grant and by user, and that the contract with the People of Porto Rico of August 26, 1914, protocolized June 8, 1915, was merely designed to afford another method of the exercise of essentially the same rights. There is apparently no dispute as to the right of the

plaintiff to obtain certain fixed amounts of irrigation water through its different intakes, and none of its right to receive also the occasional but important access of storm water, or torrential water, as it is called. The contest in this case relates to ¶ 3 of the contract, which is as follows:—

"Third. Fortuna estates is hereby granted the right while this agreement remains in force, to take, in addition to all amounts of water above specified, from the Jacaguas river by pump at the said Aruz pumping station, water which may be available there for irrigation of any of its said lands, to the extent that such taking shall not deprive any owners or users of subsisting water rights or concessions upon the Jacaguas river of the water to which such owners or users may be entitled, either by virtue of such water rights or concessions or by virtue of any agreement or agreements in regard thereto entered into or to be entered into by them with the People of Porto Rico; Provided, however, that should the People of Porto Rico at any time undertake the development and utilization of the surplus waters of this part of the Jacaguas river, this right shall be understood to be limited to a maximum usage of 3.86 second feet.

"The Fortuna estates shall maintain at the said Aruz pumping station an accurate and appropriate measuring device for the measurement of the water taken from the river at such station, which shall at reasonable time be subject to inspection by the properly accredited employees of the irrigation service."

The plaintiff contends that, as the Irrigation Bureau has determined the maximum flow of this water does not exceed 2.50 second feet, while the contract expressly allows the plaintiff a maximum of 3.86 second feet, therefore the plaintiff is entitled

Fortuna Estates v. Henna.

to all the surplus water in the river at this Aruz pumping station, and consequently to enjoin the defendants from taking any surplus water on their part; and this even if the People of Porto Rico should "at any time undertake the development and utilization of the surplus waters of this part of the Jacaguas river," which it is not conceded the People of Porto Rico have undertaken to do.

The meaning of the clause, "water which may be available there," is one of the legal issues in this case, and need not now be determined. The same is true of the question whether the rights of the parties are limited to the existing contracts with the People of Porto Rico, or are to be interpreted in the light of previous royal grants, concessions, and the user, which are so far not before the court. These are questions upon the merits, which cannot and need not be determined at present. A probable right and probable danger that the right would be defeated is all that need be shown as a basis for preliminary injunction. Colorado Eastern R. Co. v. Chicago, B. & Q. R. Co. 73 C. C. A. 132, 141 Fed. 898, 901. It is not necessary for the court to be certain that complainant is entitled to a final decree before it will grant a preliminary injunction. Central of Georgia R. Co. v. Railroad Commission, 161 Fed. 925, 992. The court will not refuse a preliminary injunction if its grant would seem to determine the main legal issue of the case. Minneapolis General Electric Co. v. Minneapolis, 194 Fed. 215. The court will not pass upon the merits of the case when provisionally presented upon a motion for preliminary injunction, if there is enough otherwise before the court to determine the injunction question.

7. The Jacaguas river, about which this controversy hinges,

is a stream rising in the mountain ranges, running east and west in Porto Rico and flowing southwardly to the Caribbean Sea. As with other rivers on the south side of the Island, however, its lower reaches are much of the time almost devoid of water. The climate south of these mountain ranges is very dry, and an elaborate system of irrigation by intakes for regular and excess water grew up in Spanish times. The cane lands lie between the mountains and the sea and have been dependent upon this water, now reinforced by the public irrigation service lately made effective by the Insular government. The new service is maintained under contracts between the local government and the different properties, sometimes entirely new, sometimes merely taking the place of the old concessionary rights, and sometimes, as in the case at bar, a combination of both systems. In order to prevent the lands higher up stream from absorbing all the water, there have to be careful regulations under both systems for the protection of the lower tenements. In the case at bar the Fortuna lands are mainly on the west side of the Jacaguas river, and the Boca Chica property on the east side. The canals conducting the Fortuna water, however, in some cases pass over the bed of the river to their lands on the other side. All in all it makes up a very complicated system, and the rights involved have to be carefully studied in order to be properly guarded.

From the proof the court is satisfied that the plaintiff has been taking water for many years under its old concessions and user substantially as at present, and that the defendants' use of the Maturi and San Fernando canals had for sometime been practically abandoned until the middle of 1915. Then at a meeting of the syndicate of owners of Jacaguas river water

Fortuna Estates v. Henna.

rights they obtained a right to use torrential waters. Such syndicates in Porto Rico take the place of the old Spanish, if not Moorish, water court, such as that which sat before the Cathedral in Valencia, as graphically portrayed in Vicente Blasco Ibañez's "La Barraca." In order to carry out this grant, defendants cleaned and enlarged their Maturi and San Fernando canals and intakes. As used, however, these were dependent upon a dam defendants built across the Jacaguas river, which after some controversy was abandoned because it took almost a third of the usual Jacaguas river water at that point and was not confined to torrential water. Instead the defendants purchased what was claimed to be surplus water from the irrigation service by a contract of December 15, 1915. This user it is which the plaintiff seems to show interferes with its own water rights, and for which it seeks the present injunction. Defendants at present obtain no water from this source, but that is because this is the dry season and the river does not rise high enough to supply such water. This will all change soon with the coming of the usual rains, and it is proper to adjust matters now. It is true the chief engineer of the irrigation service testifies that the water due the Aruz pump is now being delivered by the irrigation service at other points as agreed, but he states no facts to justify this conclusion. The court must decide only upon facts shown in evidence, and is satisfied that the old *status quo* has been and will be interfered with by the repair and extension work done by defendants to their intakes and canals.

If the defendants, under their irrigation contract, have now acquired rights which they did not have before, or if they had, by Spanish concession or otherwise, rights which they temporarily abandoned and nevertheless have a right to resume, they

will be sustained upon the hearing. This, however, is the issue in the case, and should not be determined except upon a full consideration. It would seem better to preserve the *status quo* until this can be had, even if it involves the temporary abandonment of the new user of water; but this should be done only upon a suitable bond being given by the plaintiff to pay the damages and costs of the defendants in case the right of the defendants should be determined to be superior. This principle is not unlike the frequent case of a restoration of the *status quo* in an action of unlawful detainer, although it often happens that, upon the trial of the right in ejectment, the defendant in the unlawful detainer suit may prevail on the merits. The proceeding in equity covers equitable rights, and has the advantage of combining both suits in one, and of supplying a bond to cover any damages that may result.

It follows, therefore, that, upon plaintiff's making bond in the sum of ———— thousand dollars to cover damages and costs, the preliminary injunction prayed for will be granted to restore, until further order of this court, the physical situation of the Maturi and San Fernando canals and intakes as it was immediately prior to the recent reopening of them, that is to say, to restore them so that they will receive torrential and not surplus waters of the Jacaguas river. If the defendants have not complied with this order within five days, the marshal will forthwith see that the necessary alterations are made to affect the above result, and report the same to the court. Such further orders will be made in the premises as may appear necessary.

It is so ordered.